*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 65**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellant,*

*v.*

JACOB JAMES SCHMIDT,
*Appellee.*

No. 20130326
Filed August 10, 2015

Fourth District, Provo Dep't
The Honorable Claudia Laycock
No. 121402179

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen.,
Salt Lake City, for appellant

Walter F. Bugden, Jr., Tara L. Isaacson, Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM, JUSTICE PARRISH, and JUDGE ROTH joined.

Due to his retirement, JUSTICE NEHRING did not participate herein; COURT OF APPEALS JUDGE STEPHEN L. ROTH sat.

JUSTICE DENO G. HIMONAS became a member of the Court on February 13, 2015, after oral argument in this matter, and accordingly did not participate.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1 We are asked to review a magistrate's decision, at the preliminary hearing stage, to dismiss charges of rape and child sexual abuse. Under Utah's liberal bindover standard, a magistrate must view the evidence in the light most favorable to the prosecution. This means that when reasonable inferences from the evidence cut both for and against the state's case, the magistrate

lacks discretion to choose between them and must leave such a determination to the fact-finder at trial. But a magistrate may disregard any testimony that is so inconsistent and so incredible that it is incapable of supporting a reasonable belief that the defendant committed the charged offenses. Here, the magistrate disregarded a young woman's testimony that she had been abused daily over a four-year period. The magistrate did so for three reasons: (1) inconsistent testimony regarding the letter that precipitated the sexual abuse, (2) the young woman's prior denials to her mother and investigators that there was any sexual abuse, and (3) the fact that no one had seen her engage in sexual activity with the Defendant even though she claimed to have had sex repeatedly in the common areas of the home.

¶2   We conclude that the magistrate exceeded her discretion. Although inconsistencies in the young woman's testimony and her prior denials may indicate she is being untruthful, there are plausible alternative explanations that support her allegations. And there is also testimony from two of her family members that corroborates her account of when and where some of the sexual abuse occurred. Because there is at least a reasonable inference from the evidence that the victim was telling the truth, the magistrate lacked discretion to disregard her testimony. And because her testimony described daily sexual abuse over a four-year period, the magistrate exceeded her discretion in refusing to bind the Defendant over for trial.

¶3   In reversing the magistrate's decision, we also take the opportunity to clarify statements in two recent cases—*State v. Ramirez* and *State v. Maughan*—that could be read as slight departures from the liberal bindover standard we have applied for more than a decade. In 2001, we held in *State v. Clark* that a magistrate must bind a defendant over for trial if the state presents enough evidence to support a reasonable belief that the defendant committed the crime charged—a threshold equivalent to the probable cause standard the state must meet to secure an arrest warrant. But prior to 2001, some of our decisions imposed a higher standard in preliminary hearings, requiring the state to put on evidence "from which the trier of fact could conclude *the defendant was guilty* of the offense as charged."[1] Although there is language in *Maughan* and *Ramirez* that has echoes of the more stringent standard we repudiated in 2001, both of those decisions reaffirmed the

---

[1] *State v. Anderson*, 612 P.2d 778, 783 (Utah 1980) (emphasis added), *overruled by State v. Clark*, 2001 UT 9, ¶ 16, 20 P.3d 300.

probable cause standard we adopted in *State v. Clark*. Accordingly, neither case should be read as modifying the probable cause standard magistrates currently apply at preliminary hearings.

**Background**

¶4 To determine whether a defendant should be bound over for a trial, a magistrate must "view all evidence in the light most favorable to the prosecution" and "draw all reasonable inferences in favor of the prosecution."[2] We recite the facts consistent with that standard.

¶5 Jacob James Schmidt began dating C.E.'s mother in 2002 when C.E. was eleven years old. Mother's relationship with Mr. Schmidt became serious, and he moved in with Mother and her four children later that year. They became engaged in November 2005, but their relationship began to deteriorate the following spring, culminating in a physical altercation in late April 2006. Mr. Schmidt "pinned" Mother in the hallway during an argument, she pushed him to get away, and then called the police. Mother was charged with assault, a charge the prosecutor eventually dismissed, and Mr. Schmidt moved out soon after the incident.

¶6 One week later, Mother found a shirtless picture of Mr. Schmidt on C.E.'s cell phone. Mother filed a petition for a civil stalking injunction, which the court granted, prohibiting Mr. Schmidt from contacting her or any of her children. Mother also began to suspect that C.E. and Mr. Schmidt had an inappropriate relationship. In the fall of 2006, Mother discovered that he had picked up C.E. from a high school football game and did not bring her home until the next morning. C.E. had told Mother that she "was going to stay at a friend's house" after the game. When confronted, she admitted spending the night at Mr. Schmidt's parents' home, but she claimed that she "slept in the spare bedroom." She denied ever engaging in sexual activity with Mr. Schmidt, and she repeated these denials in separate interviews with the police and a social worker at the Children's Justice Center.

¶7 Three years later, C.E. was married and pregnant with twins. After the twins were born, her marriage began to deteriorate, and she eventually moved back in with her mother. Then in early 2010, C.E.'s husband sent a text message to Mother asking whether

---

[2] *State v. Maughan*, 2013 UT 37, ¶ 14, 305 P.3d 1058 (internal quotation marks omitted).

C.E. was "acting weird because of what [Mr. Schmidt] did to her." Several months later, after conversations with Mother and Mother's new boyfriend, C.E. "came clean" and decided to tell police that Mr. Schmidt had sexually abused her repeatedly between 2002 and 2006.

¶8 Detective Joshua Christiansen of the American Fork Police Department interviewed C.E. in September 2010. C.E. told him that she and Mr. Schmidt had sex every day between June 2002 and the day he moved out in April 2006. The abuse began after Mr. Schmidt wrote her a letter "asking for her reaction if he were to touch her or she were to touch him." Mr. Schmidt eventually began touching C.E. under her clothing. The abuse progressed rapidly—within a week, Mr. Schmidt would have C.E. come downstairs to his room after Mother left for work each morning, where he would remove her clothing and engage in sexual intercourse. Eventually, he began "showing [C.E.] hard core pornography while having intercourse with her." And he also had sex with C.E. upstairs while the rest of the family was downstairs in the living room. Mr. Schmidt would lean C.E. over the half-wall that separated the basement stairs from the kitchen so C.E. could watch out for any family members coming up the stairs.

¶9 C.E. also told Detective Christiansen that Mr. Schmidt had sex with her outside on the hood of her mother's car. C.E. was eleven or twelve at the time, and Mother was asleep after taking a strong sleeping pill. According to Detective Christiansen's report, C.E. also told him that Mr. Schmidt bribed her to have anal sex with him. He paid her anywhere between $40 and $100, and on one occasion, he bought her a prepaid cell phone. Mr. Schmidt's last sexual encounter with C.E. occurred when he picked her up from a high school football game and spent the night with her at a hotel in Salt Lake County.

¶10 Based on C.E.'s allegations, the State charged Mr. Schmidt with aggravated sexual abuse of a child, two counts of attempted sodomy upon a child, five counts of rape of a child, two counts of sodomy upon a child, and one count of rape. At the preliminary hearing, C.E. testified for the prosecution, and the defense called Mother, C.E.'s brother and sister, and Detective Christiansen. After the hearing, Mr. Schmidt moved to dismiss all eleven charges, and the magistrate granted his motion.

¶11 In a written decision dismissing the charges, the magistrate began by observing that the "case depends solely on the testimony of [C.E.]." She then noted that C.E. "gave conflicting testimony about the letter that allegedly started the abuse," initially testifying "about very specific language regarding the touching" of specific body parts

and later claiming that the letter contained general language that was code for sexual touching. C.E. also testified that her mother found the letter and confronted her. But Mother said she could not remember finding any sexually explicit communications between her daughter and Mr. Schmidt. The magistrate also observed that C.E. claimed that "sexual intercourse was happening every day from age eleven to fifteen . . . in places where one would think that the family would have seen it—in the bedroom, in the hallway, by the kitchen, yet no one saw it." Finally, the magistrate noted that C.E. "either lied to the police and the interviewer at the CJC in 2006, or she has lied in 2010 when she went to the police as well as at the preliminary hearing."

¶12 The magistrate characterized the letter as "the lynchpin in many ways because" it was "the beginning . . . of the defendant's attempts to seduce [C.E.] and the start of the sexual abuse." And because C.E.'s testimony was "inconsistent about what was contained in the letter" and Mother's testimony was "inconsistent with [C.E.'s] description about her mother discovering the letter," the magistrate was "left to consider incredible and conflicting evidence." Ultimately, the magistrate concluded that the evidence presented was "so contradictory, so inconsistent, and so unbelievable" that she need not "give credence" to C.E.'s testimony. And as a consequence, the magistrate found that the "prosecution . . . failed to present evidence sufficient to support a reasonable belief that the defendant committed the crimes charged." The State appeals. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

**Standard of Review**

¶13 The State argues that the magistrate improperly denied its request to bind Mr. Schmidt over for trial. We have previously held that bindover determinations are mixed questions of law and fact "to which we grant some deference."[3] The deference we afford such a decision is "commensurate" with the limited discretion under which a magistrate operates at a preliminary hearing.[4] In particular, unlike

---

[3] *State v. Virgin*, 2006 UT 29, ¶ 16, 137 P.3d 787; *see also State v. Maughan*, 2013 UT 37, ¶ 12, 305 P.3d 1058 ("[A] magistrate's bindover decision is a mixed determination that is entitled to some limited deference.").

[4] *State v. Ramirez*, 2012 UT 59, ¶ 7, 289 P.3d 444 (internal quotation marks omitted).

fact-finders at trial, magistrates may not weigh evidence and have only limited discretion to make credibility determinations.[5] Although this discretion provides "a measure of freedom to reach one of several possible conclusions about the legal effect of a particular set of facts without risking reversal,"[6] any departure from the correct legal standard "will always exceed whatever limited discretion the magistrate has in the bindover decision."[7]

**Analysis**

¶14 We conclude that the magistrate exceeded her discretion in refusing to bind Mr. Schmidt over for trial. By disregarding C.E.'s testimony, the magistrate improperly weighed the evidence and failed to construe all reasonable inferences in the prosecution's favor. Although C.E.'s testimony contained inconsistencies and some incredible allegations, there was enough evidence presented to support a reasonable belief that Mr. Schmidt sexually abused her.

¶15 In so doing, we also take the opportunity to clarify statements we have made in two recent cases that could be read as imposing a higher evidentiary burden at a preliminary hearing than our traditional probable cause standard. Despite language in these opinions that could be read as requiring sufficient evidence to support a reasonable jury's decision *to convict* a defendant beyond a reasonable doubt, those cases—and our decision today—reaffirm that the state need only produce sufficient evidence to support a reasonable belief that the defendant *committed* the crime charged.

¶16 We begin by clarifying our precedent and articulating the legal standard magistrates should apply at preliminary hearings. We then discuss the magistrate's decision to dismiss the charges against Mr. Schmidt.

### I. The State Does Not Need to Produce Evidence Sufficient to Sustain a Conviction

¶17 For more than a decade, we have recognized that the state's burden at a preliminary hearing is probable cause—the same evidentiary threshold it must meet to secure an arrest warrant. In practice, that means a magistrate must bind a defendant over for trial if the prosecution presents evidence sufficient "to support a reasonable belief that an offense has been committed and that the

---

[5] *Id.* ¶¶ 7, 17.

[6] *Virgin*, 2006 UT 29, ¶ 27 (internal quotation marks omitted).

[7] *Ramirez*, 2012 UT 59, ¶ 7.

defendant committed it."[8] So even though the Utah Constitution provides criminal defendants with a fundamental right to a preliminary hearing,[9] "the evidentiary threshold at such hearing is relatively low."[10]

¶18 In evaluating the evidence presented at a preliminary hearing, the magistrate must draw all reasonable inferences in the prosecution's favor.[11] The "evidence does not need to be capable of supporting a finding of guilt beyond a reasonable doubt,"[12] nor do we require the prosecution "to eliminate alternative inferences that could be drawn from the evidence in favor of the defense."[13] Rather, a magistrate has discretion "to decline bindover" only "where the facts presented by the prosecution provide no more than a basis for speculation—as opposed to providing a basis for a reasonable belief."[14] It is therefore not appropriate for a magistrate to evaluate "the totality of the evidence in search of the most reasonable inference" at a preliminary hearing.[15] Our justice system entrusts that task to the fact-finder at trial.

¶19 The evidentiary threshold at preliminary hearings has not always been so low. The primary purpose of preliminary hearings is to allow magistrates to "ferret out groundless and improvident prosecutions" without usurping the jury's role as the "principal" fact-finder.[16] Perhaps to strengthen magistrates' ability to dismiss frivolous prosecutions, several of our cases prior to 2001 "equated the preliminary hearing probable cause standard with the motion for directed verdict standard," requiring the state to present "evidence sufficient to survive a *motion for directed verdict* with respect to each

---

[8] *State v. Clark*, 2001 UT 9, ¶ 16, 20 P.3d 300.

[9] UTAH CONST. art. I, § 13; *State v. Hernandez*, 2011 UT 70, ¶ 29, 268 P.3d 822.

[10] *State v. Ramirez*, 2012 UT 59, ¶ 9, 289 P.3d 444.

[11] *State v. Virgin*, 2006 UT 29, ¶ 24, 137 P.3d 787.

[12] *Id.* ¶ 20 (internal quotation marks omitted).

[13] *Ramirez*, 2012 UT 59, ¶ 9.

[14] *Virgin*, 2006 UT 29, ¶ 21.

[15] *State v. Maughan*, 2013 UT 37, ¶ 17, 305 P.3d 1058.

[16] *Virgin*, 2006 UT 29, ¶¶ 19, 21.

element of the crime."[17] These cases seemed to require a magistrate "to submit the case to the jury" only "if the evidence [was] sufficient that a reasonable jury could find the defendant guilty beyond a reasonable doubt."[18] In other cases, we described the standard somewhat differently, holding that "the minimum quantum of evidence [was] more than [what is] required to establish probable cause for arrest but less than would prove the defendant guilty beyond a reasonable doubt."[19] We characterized the standard as one that was "lower, even, than a preponderance of the evidence standard applicable to civil cases."[20]

¶20  We disavowed these cases in *State v. Clark*.[21] In that case, we held that "unlike a motion for a directed verdict," the evidence necessary to bind a defendant over for trial "need not be capable of supporting a finding of guilt beyond a reasonable doubt."[22] And we observed that there was "no principled basis for attempting to maintain a distinction between the arrest warrant probable cause standard and the preliminary hearing probable cause standard."[23] Instead, we concluded that "at both the arrest warrant and the preliminary hearing stages, the prosecution must present sufficient evidence to support a reasonable belief that an offense has been committed and that the defendant committed it."[24]

¶21  Our decisions in two recent cases—*State v. Ramirez* and *State v. Maughan*—correctly apply this standard. But we take this opportunity to clarify statements in both cases that could be read as modifying the probable cause standard. In *Ramirez*, for example, we

---

[17] *Clark*, 2001 UT 9, ¶ 12 (internal quotation marks omitted); *see also State v. Anderson*, 612 P.2d 778, 783 (Utah 1980) ("[T]he probable cause showing at the preliminary examination must establish a prima facie case against the defendant from which the trier of fact could conclude the defendant was guilty of the offense as charged.").

[18] *Clark*, 2001 UT 9, ¶ 13.

[19] *Anderson*, 612 P.2d at 783 n.13.

[20] *State v. Pledger*, 896 P.2d 1226, 1229 (Utah 1995) (internal quotation marks omitted).

[21] 2001 UT 9.

[22] *Id.* ¶ 15.

[23] *Id.* ¶ 16.

[24] *Id.*

reaffirmed that the "'reasonable' belief formulation" in a bindover determination "parallels the standard for an arrest warrant."[25] In applying that standard, however, we concluded that bindover was proper because there was a "non-speculative basis for *the jury to find against Ramirez on each of the elements of his crimes*,"[26] language that could be read as requiring a reasonable basis for a *conviction* instead of merely a reasonable belief that the defendant committed the crime in question. Similarly, in *Maughan*, we correctly characterized the bindover standard as requiring "evidence sufficient to support a reasonable belief that the defendant committed the charged crime."[27] But later in the opinion, we stated that the bindover standard "asks only whether the evidence could support a reasonable jury's *decision to convict*, through a lens that view[s] all evidence in the light most favorable to the prosecution."[28]

¶22 Mr. Schmidt has not argued that these decisions implicitly overruled our prior precedent, and in both *Ramirez* and *Maughan*, we explicitly reaffirmed the probable cause standard adopted in *Clark*.[29] But to avoid any potential confusion, we now make clear that neither case altered our liberal bindover standard—rather, "at both the arrest warrant and the preliminary hearing stages, the prosecution must present sufficient evidence to support a reasonable belief that an offense has been committed and that the defendant committed

---

[25] *Ramirez*, 2012 UT 59, ¶ 9.

[26] *Id.* ¶ 16 (emphasis added).

[27] 2013 UT 37, ¶ 14 (internal quotation marks omitted).

[28] *Id.* ¶ 17 (alteration in original) (emphasis added) (internal quotation marks omitted).

[29] *See id* ¶ 14 ("To bind a defendant over for trial, the prosecution is required only to produce believable evidence of all the elements of the crime charged, or, in other words, evidence sufficient to support a reasonable belief that the defendant committed the charged crime." (internal quotation marks omitted)); *Ramirez*, 2012 UT 59, ¶ 9 ("As we have emphasized, a showing of probable cause entails only the presentation of evidence sufficient to support a reasonable belief that the defendant committed the charged crime. The reasonable belief formulation parallels the standard for an arrest warrant." (internal quotation marks omitted)).

it,"[30] not a reasonable basis for a conviction beyond a reasonable doubt.

## II. We Conclude That the Magistrate Exceeded Her Discretion in Refusing to Bind Mr. Schmidt Over for Trial

¶23 Having articulated the legal standard courts should apply at preliminary hearings, we now examine whether the magistrate exceeded her discretion in this case. We conclude that she did. The magistrate refused to bind Mr. Schmidt over for trial because she found C.E.'s testimony so inconsistent and unreliable that "it would be unreasonable to base belief on the element of sexual intercourse or any other sexual conduct" on her assertions. In so doing, the magistrate improperly weighed the evidence rather than drawing all reasonable inferences in the prosecution's favor. Although there are certainly some inconsistencies and incredible allegations in C.E.'s testimony, we cannot conclude that her assertions were so lacking in reliability that the State failed to establish probable cause, particularly in light of other testimony that corroborates some of her allegations.

### A. The Victim's Allegations, if Credible, Are Sufficient to Support a Finding of Probable Cause

¶24 We begin by noting that C.E.'s allegations of sexual abuse—if credible—provide probable cause to bind Mr. Schmidt over for trial.[31] There are ten charges at issue on appeal: aggravated sexual abuse of a child, attempted sodomy upon a child,[32] five counts of rape of a child, two counts of sodomy upon a child, and rape. Sexual offenses are often committed in secrecy.[33] For that reason, we have

---

[30] *Clark*, 2001 UT 9, ¶ 16.

[31] *See State v. Virgin*, 2006 UT 29, ¶ 25, 137 P.3d 787 (noting that magistrates may only disregard evidence at a preliminary hearing if it is "so contradictory, inconsistent, or unbelievable that it is unreasonable to base belief of an element of the prosecutor's claim on that evidence").

[32] The information contains two counts of attempted sodomy upon a child, but the prosecutor voluntarily dismissed the second count at the preliminary hearing.

[33] *See Virgin*, 2006 UT 29, ¶ 38 (noting that "child sexual abuse cases often rest solely on the testimony of a young child"); *State v. Studham*, 572 P.2d 700, 701 (Utah 1977) (noting that rape is often committed "in such secrecy as can be effected" and that therefore

(Continued)

recognized that a "jury can convict on the basis of the uncorroborated testimony of the victim" as long as the testimony is not so inherently incredible that no reasonable person could accept it.[34] If uncorroborated testimony is enough to demonstrate guilt beyond a reasonable doubt, it also satisfies the less stringent probable cause standard at a preliminary hearing. And here, C.E.'s testimony, if credible, provides a reasonable basis to conclude that Mr. Schmidt committed each of the offenses at issue. We discuss each charge in turn.

¶25 First, C.E.'s testimony would support a reasonable belief that Mr. Schmidt committed at least one count of aggravated sexual abuse of a child. That offense occurs when a person touches "the anus, buttocks, or genitalia of any child, the breast of a female child, or otherwise takes indecent liberties with a child."[35] C.E. testified that soon after she and Mr. Schmidt wrote to each other about sexual touching, she "started coming down at like 6:00 in the morning when [her] mom would leave for work" and "crawling in bed" with Mr. Schmidt. In the bed, she would touch his penis and he would touch her vagina—"It started out over the clothes, and then it would progress to under the clothes."

¶26 Second, C.E.'s allegations support a reasonable belief that Mr. Schmidt committed attempted sodomy upon a child and two counts of sodomy upon a child. "A person commits sodomy upon a child if the actor engages in any sexual act upon or with a child who is under the age of 14, involving the genital or anus of the actor or the child and the mouth or anus of either person . . . ."[36] C.E. testified that she "probably" had anal sex with Mr. Schmidt "more than ten" times total, and "[m]aybe three times" before she turned thirteen. The first time, when she was eleven or twelve, Mr. Schmidt attempted to have anal intercourse with C.E. in Mother's bed but

_____

"the question of guilt or innocence often depends upon the weighing of the credibility of the victim against that of the accused").

[34] *State v. Robbins*, 2009 UT 23, ¶¶ 14, 16, 210 P.3d 288 (internal quotation marks omitted); *see also Studham*, 572 P.2d at 701–02 ("[T]he rule is that if there is nothing so inherently incredible about the victim's story that reasonable minds would reject it, a conviction may rest upon her testimony alone.").

[35] UTAH CODE § 76-5-404.1(2).

[36] *Id.* § 76-5-403.1(1).

stopped at C.E.'s request because "it hurt way too bad." On another occasion, Mr. Schmidt offered to buy C.E. a cell phone in exchange for anal sex. She agreed, and "just let it happen" in the hallway before Mother came home from work because C.E. "wanted the phone." C.E. also testified that most of her sexual encounters with Mr. Schmidt were preceded by oral sex.

¶27 Third, C.E.'s testimony supports a reasonable basis to believe Mr. Schmidt committed five counts of rape of a child. "A person commits rape of a child when the person has sexual intercourse with a child who is under the age of 14."[37] C.E. testified that when she was "thirteen or fourteen," she left school with Mr. Schmidt and drove up American Fork Canyon, where they engaged in vaginal intercourse. She also stated that Mr. Schmidt had sex with her "[a]ll the time. . . . Almost every day" between the ages of eleven and fourteen, "sometimes more than once." She claimed that sometimes they would have sex in Mr. Schmidt's room in the morning after Mother left for work while Mr. Schmidt played pornographic videos. At other times, he would take her upstairs to have sex while the rest of the family watched TV in the basement. C.E. also claimed that one night after her mother had taken a sleeping pill, Mr. Schmidt had sex with her outside on the hood of Mother's car. C.E. was twelve or thirteen at the time. And during a family trip to Lava Hot Springs when C.E. was thirteen, Mr. Schmidt had sex with her "[d]own by the pool behind a tree" while her inebriated mother relaxed by the pool.

¶28 Finally, C.E.'s testimony also supports a reasonable belief that Mr. Schmidt committed one count of rape. "A person commits rape when the actor has sexual intercourse with another person without the victim's consent."[38] By statute, a victim cannot consensually participate in sexual activity if the victim is "younger than 18 years of age and at the time of the offense[,] the actor was the victim's parent, stepparent, adoptive parent, or legal guardian or occupied a position of special trust in relation to the victim."[39] Utah law in this context defines "position of special trust" to include "a cohabitant of" the victim's "parent" or any other person "in a position of authority" who "enables the person to exercise undue

---

[37] *Id.* § 76-5-402.1(1).

[38] *Id.* § 76-5-402(1).

[39] *Id.* § 76-5-406(10).

influence over the child."[40] C.E. testified that when she was fifteen, Mr. Schmidt picked her up from a high school football game soon after he moved out of the family's home. They drove to a motel somewhere in Salt Lake County—possibly Midvale—where they spent the night and had sex. Although Mr. Schmidt was not living with Mother at the time, the evidence supports a reasonable belief that he was in a position of special trust and exercised undue influence over C.E. Mr. Schmidt lived with the family for five years, and he and Mother were briefly engaged before he moved out. During that time, he went on trips with the family, picked C.E. up from school, and was someone C.E. claimed she could "turn to because he would listen to me and he would be there."

¶29 In summary, these allegations—if credible—are sufficient to support a reasonable belief that Mr. Schmidt committed aggravated sexual abuse of child, attempted sodomy upon a child, two counts of sodomy upon a child, five counts of rape of a child, and rape. The question, then, is whether C.E.'s allegations were "wholly lacking and incapable of creating a reasonable inference regarding a portion of the prosecution's claim."[41] If so, the magistrate had discretion to disregard them. But if the totality of the evidence presented two plausible alternatives, even if one appeared more plausible than the other, the magistrate was required to "leave all the weighing of credible but conflicting evidence to the trier of fact."[42]

¶30 Consequently, we now turn to the inconsistent testimony and incredible allegations that prompted the magistrate to dismiss all charges. For a number of reasons, we conclude that the magistrate exceeded her discretion by disregarding C.E.'s testimony.

*B. Conflicting Testimony and C.E.'s Prior Denials Are Not Enough to Discredit Her Allegations*

¶31 As we have discussed, magistrates "may make credibility determinations in preliminary hearings, but the extent of those determinations is limited."[43] It is not appropriate "for a magistrate to weigh credible but conflicting evidence at a preliminary hearing," because such a hearing "is not a trial on the merits."[44] Rather,

---

[40] *Id.* § 76-5-404.1(1)(c)(vi), (xxii).

[41] *Virgin*, 2006 UT 29, ¶ 24 (internal quotation marks omitted).

[42] *Id.*

[43] *Id.* (internal quotation marks omitted).

[44] *Id.* (internal quotation marks omitted).

magistrates "must leave all the weighing of credible but conflicting evidence to the trier of fact and must view the evidence in a light most favorable to the prosecution[,] resolv[ing] all inferences" in its favor.[45] Accordingly, magistrates may disregard evidence as incredible only where it is "so contradictory, inconsistent, or unbelievable that it is unreasonable to base belief of an element of the prosecutor's claim on that evidence."[46]

¶32 Here, although there were inconsistencies in the testimony presented at the preliminary hearing and some seemingly incredible allegations, we conclude that they were insufficient to render C.E.'s testimony wholly unreliable. In its written decision refusing to bind Mr. Schmidt over for trial, the magistrate identified three reasons for disregarding C.E.'s testimony: (1) inconsistent testimony regarding the letter that precipitated the sexual abuse, (2) C.E.'s prior denials to her mother and investigators that there was any sexual abuse, and (3) the fact that no one had seen C.E. engage in sexual activity with Mr. Schmidt even though she claimed to have had sex repeatedly in the common areas of the home. We address each of these in turn.

¶33 First, the magistrate overlooked a reasonable explanation for the inconsistent testimony about the letter C.E. claimed led to the sexual abuse. C.E. testified that when she was eleven, she and Mr. Schmidt wrote a letter back and forth that eventually "led into[,] like[,] what if I did this to you or what if I touched you here." When the prosecutor asked for more detail, C.E. claimed the letter said, "Like what if I touch your boobs or what if I touch your vagina." But on cross-examination, in response to a question about the specific terms Mr. Schmidt used, C.E. admitted that the letter "didn't have words like that. He would use words like pay the price"—terms that she understood in the context of their communications as "clearly sexual." Additionally, C.E. claimed that her mother found the letter and confronted her the next day, but Mother testified she had no memory of finding and discussing the letter with C.E.

¶34 These inconsistencies may provide a basis to undermine C.E.'s credibility at trial, but they are insufficient to allow a magistrate to wholly disregard her testimony. In responding to the prosecutor's initial questioning about the letter, C.E. may have simply recounted what she understood from reading the letter, not

---

[45] *Id.* (alterations in original) (internal quotation marks omitted).

[46] *See id.* ¶ 25; *see also State v. Ramirez*, 2012 UT 59, ¶ 10, 289 P.3d 444.

reported its contents verbatim. If so, her statements during cross-examination that the letter contained more general terms that were code for sexual touching are not inconsistent with her direct testimony, but a clarification in response to a more specific question. And if that's the case, her testimony is also consistent with how Mother and Detective Christiansen described the letter. Mother testified that she remembered her daughter "writing back and forth" with Mr. Schmidt, but she did not recall anything sexual, and there is no reason that she would have if the letter were written in vague, general terms. Detective Christiansen testified that after his initial interview with C.E., he could not "recall the exact content" of the letter. He said he did not "remember the specifics," and that "[w]hen [he] talked to her, it was generalized."

¶35 The general language in the letter may also explain why C.E. remembered discussing it while Mother did not. According to her testimony, Mother was aware that Mr. Schmidt wrote notes back and forth with C.E., and she may have asked C.E. about them without realizing their significance. But C.E., who may have wanted to conceal the nature of the letters from her Mother, could have interpreted Mother's innocent inquiry as confrontational questioning. As a result, years later C.E. might have vivid memories of concealing sexual communications from her Mother, while Mother would have trouble recalling a short conversation about notes she believed were innocuous.

¶36 Mother's and Detective Christiansen's testimony suggests that it is not implausible to read C.E.'s seemingly inconsistent testimony about the letter as truthful responses to different questions, one general and the other more specific. And there is also a plausible explanation for why C.E. remembered her Mother confronting her about the letter, but Mother had no such recollection. Of course, it is also plausible that C.E.'s story seems hard to pin down because she's making it up as she goes along. But in the face of two plausible inferences from the evidence—one that supports bindover and one that does not—a magistrate lacks discretion to engage in "an assessment of whether such inference is more plausible than an alternative that cuts in favor of the defense."[47] These inconsistencies are therefore insufficient to justify the court's decision to disregard C.E.'s testimony.

---

[47] *Ramirez*, 2012 UT 59, ¶ 10.

¶37 Second, C.E.'s prior denial of sexual abuse does not wholly discredit her testimony. The magistrate noted that because C.E. had previously denied suffering any sexual abuse in a 2006 interview with a social worker at the Children's Justice Center, she was "left to consider incredible and conflicting evidence." But common experience with rape and child sexual abuse cases indicates that it is not unusual for a victim to initially deny the abuse before later developing enough courage to come forward.[48] Here, it is certainly possible that C.E. told investigators the truth in 2006 and lied in 2010, but it is just as plausible that C.E.—like other victims of child sexual abuse—developed an affinity for Mr. Schmidt over time and denied the abuse because she feared the legal consequences of their relationship. And that is exactly how she explained her denials at the preliminary hearing. She claimed that she "was devastated" when Mr. Schmidt moved out of the house because she "did love him," and she concealed their relationship from her mother and investigators because she "still cared" about Mr. Schmidt and "didn't want him or I to get in trouble." Consequently, there were two plausible inferences from C.E.'s initial denials, and the magistrate lacked the discretion to weigh the evidence and choose between them.

¶38 Third, although some of C.E.'s allegations of sexual abuse seem incredible, other testimony corroborated aspects of C.E.'s story, creating a reasonable inference that she was telling the truth. The magistrate noted that C.E. claimed "sexual intercourse was happening every day from age eleven to fifteen when the defendant moved out" in "places where one would think that the family would have seen it—in the bedroom, in the hallway, by the kitchen, yet no one saw it." The magistrate's concern is not unfounded. C.E. testified that she had sex in the kitchen with Mr. Schmidt "[m]ore than 50 times" while her whole family was downstairs. She also claimed in a written statement to police that she had sex with Mr. Schmidt

---

[48] *See State v. Curtis*, 2013 UT App 287, ¶ 37, 317 P.3d 968 (noting that in a case involving rape and provision of drugs to a minor, the victim denied any sexual activity with the defendant in an interview with DCFS but later came forward and "recanted her previous denials"); Elizabeth Mertz & Kimberly A. Lonsway, *The Power of Denial: Individual and Cultural Constructions of Child Sexual Abuse*, 92 NW. U. L. REV. 1415, 1426 (1998) (noting that in one study of "children with confirmed histories of sexual abuse," only "11% of the children actually told their stories in a clear and unhesitating fashion" and many "expressed . . . denial or hesitation").

"almost 365 days a year for four years," sometimes "two or three times a day."

¶39 These allegations may be difficult to accept wholesale. But in her written decision dismissing all charges, the magistrate did not discuss other testimony that corroborated C.E.'s description of her relationship with Mr. Schmidt. In particular, C.E.'s brother testified that she had a "fairly close" connection with Mr. Schmidt and perceived that C.E. was jealous of Mother's relationship with him. When C.E.'s brother was about ten or eleven, he "walked downstairs in [his] mom's bedroom" and saw C.E. "in the bed, [Mr. Schmidt] was in the bed with her" with the covers "up to their necks," and there was "porn playing" on the television. He said "[i]t was late," "definitely bedtime," and the pornography was quite graphic, depicting "[m]ultiple partners" engaged in "anal or vaginal intercourse." And C.E.'s brother and sister both testified that Mr. Schmidt slept nude "[p]robably every night." Mother also noticed alarming conduct between Mr. Schmidt and her daughter. Mother testified that one evening, she walked upstairs and saw them "both standing in the kitchen and [Mr. Schmidt] had his boxers on and . . . she ha[d] her hand . . . on his penis through his boxers." She further testified that Mr. Schmidt and C.E. "[q]uite often . . . would be off alone."

> Yeah, they would go into her room and then I would, you know, because I'd be downstairs with them, all of a sudden they'd disappear and then they'd be in her room, you know, and the door would be open, but they'd be in her room and so then I'd go hang out with them in their room and then they'd take off and go downstairs. Many times he would take her and just her.
>
>      Take her where?
>
> Take her to the store, you know, saying he was going to go pick up her friend and they would take a long time.

¶40 The testimony from these witnesses, standing alone, may be insufficient to establish probable cause that Mr. Schmidt committed any of the charged offenses. But when coupled with C.E.'s description of the abuse—which included intercourse in the kitchen and in Mother's room while Mr. Schmidt played pornography on the television—this additional testimony provides at least a plausible basis to conclude that many of C.E.'s allegations are true. And at a preliminary hearing, a magistrate's role "does not encompass an

assessment of whether such inference is more plausible than an alternative that cuts in favor of the defense."[49]

¶41 In summary, despite inconsistent testimony, C.E.'s prior denials of sexual abuse, and some incredible allegations, none of these concerns rendered C.E.'s testimony wholly implausible, particularly in light of other testimony that corroborated aspects of her basic story. And even if it appears more likely than not after the preliminary hearing that C.E. has fabricated some of her allegations against Mr. Schmidt, the magistrate had an obligation to view the evidence in a light most favorable to the prosecution and lacked discretion to credit a plausible inference in Mr. Schmidt's favor over evidence that would support a plausible alternative to the contrary.[50]

¶42 For these reasons, we conclude that the magistrate exceeded her discretion in refusing to bind Mr. Schmidt over for trial. By wholly disregarding C.E.'s testimony, the magistrate impermissibly weighed the evidence instead of viewing witnesses' testimony in the light most favorable to the prosecution.

## Conclusion

¶43 We reverse the magistrate's decision refusing to bind Mr. Schmidt over for trial. At the preliminary hearing stage, even if C.E.'s allegations appear facially implausible, the magistrate lacked discretion to disregard them in light of other evidence that corroborated aspects of her basic story, and C.E.'s testimony provides a reasonable basis to believe that Mr. Schmidt committed the offenses at issue. The inconsistent testimony, C.E.'s prior denials of sexual abuse, and her perhaps incredible allegations are insufficient to eliminate plausible explanations that weigh in favor of submitting the case to a jury. And at a preliminary hearing, magistrates have an obligation to construe all evidence in the prosecution's favor. We therefore conclude that the magistrate exceeded her discretion and remand for further proceedings consistent with this opinion. In so doing, we reaffirm that at a

---

[49] *Ramirez*, 2012 UT 59, ¶ 10.

[50] *See Virgin*, 2006 UT 29, ¶ 18 (noting that probable cause in a preliminary hearing "is the same as the probable cause that the prosecution must show to obtain an arrest warrant"); *State v. Poole*, 871 P.2d 531, 535 (Utah 1994) (noting that probable cause "is a flexible, common-sense standard" and that it "does not matter if the officer's belief 'was correct or more likely true than false'" (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

preliminary hearing, the state need only produce evidence sufficient to support a reasonable belief that the defendant committed the crime charged, not evidence that would support a conviction beyond a reasonable doubt.

———————