**2019 UT App 101**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
JANA CLYDE,
Appellee.

Opinion
No. 20180197-CA
Filed June 13, 2019

Eighth District Court, Duchesne Department
The Honorable Lyle R. Anderson
No. 171800359

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellant

Peter Stirba, Wendy Brown, and Matthew Strout,
Attorneys for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

POHLMAN, Judge:

¶1     A magistrate must bind over a defendant for trial if he or
she finds probable cause to believe that the defendant committed
the crime charged. The magistrate here declined to bind Jana
Clyde over for negligent homicide because he heard "no direct
evidence that it was a gross deviation" from the standard of care
for Clyde, a jailhouse nurse, not to treat an inmate for
dehydration. The State appeals, and we reverse.

## BACKGROUND[1]

### *The Inmate's Medical Treatment*

¶2    Clyde was a licensed practical nurse (LPN) at the Duchesne County Jail. On a Sunday, a young woman (Inmate) was booked into the jail on drug charges. By Thursday, she was dead.

¶3    *Sunday*. The booking report lists Inmate's weight at 129 pounds. When Inmate was booked, she tested positive for heroin and informed jail personnel on an intake form that she had a history of drug abuse and was withdrawing from drugs or alcohol. Inmate also noted on the intake form that she was taking medication for high blood pressure. Clyde generally had access to inmate intake forms.

¶4    *Monday*. Clyde saw Inmate to discuss her medication. Inmate appeared to be "a little weak," and Inmate said that she "hadn't been feeling good" and "probably had the flu." Inmate also had "been throwing up a little but wasn't real concerned about that." Clyde approved Inmate's blood-pressure medication and tested her blood pressure. Clyde concluded that it was "a little elevated" but that Inmate had not taken her pills yet. When Clyde asked Inmate about her drug use, Inmate responded that she did not have "any drugs in her system" and that it "had been several days since she'd used anything." Clyde testified that she thought, "Chick, you do some serious drugs and I know you're lying to me."

---

1. In reviewing a magistrate's bindover decision, we "view all evidence in the light most favorable to the prosecution and draw all reasonable inferences in favor of the prosecution." *State v. Schmidt*, 2015 UT 65, ¶ 4, 356 P.3d 1204 (cleaned up). We recite the facts with that standard in mind.

¶5     Clyde then gave Inmate her medication with a sports drink and arranged for Inmate to receive the blood-pressure medication twice a day. She also told Inmate to let her know if she wanted her blood pressure taken again and that she could fill out a medical request form to see the jail's physician assistant (PA) who visited on Thursdays.

¶6     *Tuesday*. A correctional officer at the jail (First Officer) noticed that Inmate was getting "weaker." First Officer told Clyde that Inmate was "not looking good" and that she wanted to give her a sports drink because "she kept throwing up." Clyde said that was fine.

¶7     Later in the day, First Officer again informed Clyde that Inmate was "not looking good" and was still "throwing up a lot." Clyde said to have Inmate fill out a medical request form for the PA's next visit.

¶8     Inmate filled out the medical request form, explaining that she had been "puking for 4 days straight," had "diarrhea," and could not "hold anything down[,] not even water." Inmate insisted that she was "not detoxing" and instead had a "stomach bug." Once the form was filled out, First Officer delivered it to Clyde. Clyde did not notify the PA.

¶9     First Officer also decided to move Inmate to a court-holding cell "to be watched more closely."[2] The holding cell

_____

2. There is some dispute as to when Inmate was moved, but Clyde agrees that "if one possible timeline of events is more helpful to the State's case, [we] should assume that timeline applies." First Officer testified that Inmate was moved to court holding on Tuesday. A detective assigned to Inmate's case also testified about the move and thought Inmate may have been placed in court holding on Monday or on Thursday but ultimately was unsure about which day. We assume the move

(continued…)

contains a video camera that First Officer believed would help with Inmate's medical observation. The camera showed Inmate using "the restroom several times" and vomiting a "brown substance." And though there was a sports drink bottle in the cell, First Officer stated that the camera did not capture Inmate taking in "a ton of fluid."

¶10    *Wednesday*. Another correctional officer (Second Officer) took medication to Inmate, but Inmate "said she was too sick to get out of bed." Ordinarily, the officers deliver medication at a "cuff port" so that they do not have to enter the cell. But because Inmate could not move, Second Officer "walked in there and gave her [the] medication." Inmate "didn't look normal," and it appeared that she had been vomiting. Second Officer may have informed Clyde of Inmate's condition. Clyde later gave a sports drink to Inmate through the cuff port.

¶11    *Thursday*. The PA came to the jail for his weekly visit. Clyde and the PA discussed Inmate and went to the court-holding cell to see her. Once there, Inmate did not respond to Clyde's voice or knocking on the door, and the PA told Clyde to call an ambulance. Inmate was found dead, weighing 87 pounds.[3]

*The Preliminary Hearing*

¶12    The State charged Clyde with negligent homicide. At a preliminary hearing to determine whether Clyde should be

---

(…continued)
happened on Tuesday, viewing the facts in the light most favorable to the State. Whether it happened earlier does not affect our resolution of the case.

3. There was also testimony that Inmate weighed 112 pounds at the time of her death.

bound over for trial on that charge, the State presented, among other evidence, testimony from the medical examiner who performed Inmate's autopsy, a recorded interview with Clyde, and testimony from a registered nurse (RN) from another jail.

¶13   The medical examiner determined that Inmate "died as a result of complications of dehydration in the setting of opiate withdrawal." In his examination of Inmate's body, the medical examiner noted "findings consistent with dehydration such as sunken eyes, tenting of skin, and reduced . . . tissue turgor." The examiner testified that he based his final conclusion about the cause of death on Inmate's electrolyte results, which were "severely in the abnormal range" and indicative of "profound dehydration."

¶14   The examiner opined that dehydration is a "reversible condition" that can generally be cured, absent cardiac arrhythmia, almost up to the time of death with the use of IV fluids. He explained that fluids should be given intravenously so that they are absorbed by the body; giving fluids orally, in the examiner's experience, "will not resolve dehydration" once "there is a problem with either throwing up or diarrhea or a combination" of the two.

¶15   Next, the State introduced Clyde's interview with a detective. In the interview, Clyde explained that she knew it takes three to five days for the symptoms of heroin withdrawal to manifest. Clyde knew that the symptoms of heroin withdrawal include "elevated blood pressure[]," "diarrhea," "throwing up," and being "weak." As a nurse, Clyde knew the appropriate protocol in treating someone suffering from heroin withdrawal is to monitor blood pressure, provide fluids, and contact the PA. Clyde stated in the interview that if inmates demanded to see a doctor, she would "do a really good evaluation on them" by performing a "full set of vital signs," running a "dehydration test," "check[ing] their eyes,"

"check[ing] their mouth for saliva," and "do[ing a] tenting test." She would then "keep an eye" on them, observing things like whether "they [are] up and moving" and whether they are "keeping anything that they're taking in down."

¶16   Finally, the RN[4] testified that "in assessing the risk of someone who's been vomiting and having diarrhea for four days," an LPN "definitely should see it as . . . a potentially very dangerous situation." He testified that in that situation he, as an RN, would "immediately contact the" PA for orders to test her blood, "possibly start some IVs," and "even go to the hospital." The RN also explained that he would "continually watch[] vital signs," monitor eating and drinking, and run "blood labs" if he was unable "to get the vomiting and diarrhea under control with medication." The RN stated that the cause of the vomiting and diarrhea—whether heroin withdrawal or the flu—would not affect the treatment. Based on what he knew about Inmate's medical condition, he would have expected Clyde to do three things: chart Inmate's vital signs, contact the PA, and "follow up [a] minimum [of] twice a day." The failure to do so, in the RN's view, was a "deviation from the standard of care" expected from nurses.

¶17   After hearing the evidence, the magistrate acknowledged that "the standard for bindover is really very low," placing the standard somewhere between that needed for an arrest warrant and that needed to resist a directed verdict. The magistrate questioned whether "knowing that someone has been vomiting and had diarrhea for four days communicates the existence of a risk of death that's so significant that immediate action is

---

4. According to the RN's testimony, registered nurses generally have more training than LPNs, giving registered nurses "quite a bit more breadth [than LPNs in what] they can do before they contact a medical provider."

warranted." The magistrate stated that he did not "have any evidence of how substantial this risk is"—one in ten or one in ten thousand. Ultimately, the magistrate concluded that he "definitely ha[d] evidence that [for Clyde] to not do something immediately was a deviation from the standard of care" but that there was "no direct evidence that it was a gross deviation," as required for criminal negligence. Unable to "bridge" the gap between ordinary negligence and criminal negligence without such evidence, the magistrate dismissed the charges against Clyde.

¶18    The State appeals.


ISSUE AND STANDARD OF REVIEW

¶19    The State contends that the "magistrate erroneously refused to bind [Clyde] over for negligent homicide." "Bindover determinations are mixed questions of law and fact to which we grant some deference." *State v. Schmidt*, 2015 UT 65, ¶ 13, 356 P.3d 1204 (cleaned up). That deference is "commensurate with the limited discretion under which a magistrate operates at a preliminary hearing." *Id.* (cleaned up). At a preliminary hearing, a magistrate may make limited credibility determinations but "may not weigh evidence." *Id.* "Any departure from the correct legal standard will always exceed whatever limited discretion the magistrate has in the bindover decision." *Id.* (cleaned up).


ANALYSIS

¶20    We must decide whether the State presented enough evidence for the magistrate to bind Clyde over for trial. As everyone agrees, the standard for bindover is relatively low. *See State v. Ramirez*, 2012 UT 59, ¶ 9, 289 P.3d 444. "All that is required is reasonably believable evidence—as opposed to

speculation—sufficient to sustain each element of the crime(s) in question." *Id.* If this standard—the same as to secure an arrest warrant—is met, the magistrate *must* bind the defendant over for trial. *State v. Schmidt*, 2015 UT 65, ¶ 17, 356 P.3d 1204; *see also* Utah R. Crim. P. 7B(b).[5]

¶21 The crime in question here is negligent homicide, which requires evidence that, in addition to "caus[ing] the death of another,"[6] Clyde (1) should have been aware of a "substantial and unjustifiable risk" of death and (2) "gross[ly] deviat[ed] from the standard of care that an ordinary person would exercise in all the circumstances" in failing to perceive that risk. *See* Utah Code Ann. §§ 76-2-103(4), 76-5-206(1) (LexisNexis 2017).

¶22 The State contends that the magistrate erred in concluding there was insufficient evidence to support that Clyde's conduct constituted a gross deviation from the ordinary standard of care. In response, Clyde defends the magistrate's decision while also contending that the State's evidence "fell short" in two other respects. Specifically, Clyde invites this court to affirm the magistrate's decision based on the alternative grounds that the State failed to show the applicable standard of care or the severity of the risk that existed. Beginning with the applicable standard of care, we address all three arguments in turn.

---

5. Before May 1, 2018, this rule was numbered as rule 7(i)(2) of the Utah Rules of Criminal Procedure. Because the rule in effect at the time of Clyde's preliminary hearing does not materially differ from that now in effect, we cite the current rule.

6. This element is not disputed, at least not for purposes of the bindover.

I. The Applicable Standard of Care

¶23     Clyde first argues that to prove negligent homicide, the State must establish the standard of care that is expected under the circumstances. Clyde then contends that we should affirm the magistrate's bindover decision because the State failed "to establish what standard of care applied specifically to . . . an LPN working at the [j]ail." She asserts that neither the RN's nor the medical examiner's testimony established the specific standard of care "applicable to medical personnel." According to Clyde, the medical examiner's testimony—that dehydration was reversible almost up to the time of death—was "borderline nonsensical" and "inoperable as a standard of care" because "there was no discussion as to how to calculate" the time of death "when there is 'a recovery.'" And the RN's testimony similarly failed to establish a standard of care, in Clyde's view, because the RN "talked in terms of what *he* would do" as a registered nurse at a larger jail facility, never expressing "what was standard in the industry." (Emphasis added.) Clyde then suggests that the RN, who may simply have been "overly cautious," did not necessarily represent the typical standard of care exercised by a jailhouse medical professional.

¶24     The State counters that the preliminary hearing evidence was sufficient on this point. It stresses that Clyde, while focusing on the RN's and medical examiner's testimonies, ignores "her own damning statements." In her interview, Clyde stated that she knew the appropriate protocol in treating someone suffering from heroin withdrawal would be to monitor blood pressure, provide fluids, and contact the PA. And when asked what she would do if an inmate demanded medical attention, Clyde responded that she would "do a really good evaluation," check "vital signs," perform a "dehydration test," and "keep an eye" out to ensure that the person was "keeping anything that [he or she was] taking in down." The State also defends the medical examiner's testimony as "[i]nferentially . . . support[ing] the

standard of care established by" Clyde's statements. The State argues that "the inability to calculate exactly when death might occur does nothing to undermine . . . the ordinary standard of care" but rather "emphasizes the substantial risk of inaction at the first sign of serious trouble." And the RN's testimony, according to the State, "adequately defined, for preliminary hearing purposes, the standard of care" because there is a "reasonable inference" that the RN's testimony "would address the standards of care applicable to all nurses." So when the RN testified that he would have expected Clyde to chart Inmate's vital signs, contact the PA, and "follow-up [a] minimum [of] twice a day," the State asserts that he helped define the applicable standard of care.

¶25   We agree with the State. "The bindover standard is intended to leave the principal fact finding to the jury." *State v. Virgin*, 2006 UT 29, ¶ 21, 137 P.3d 787. And in criminal negligence cases, like this one, "the jury decides not only the facts, but also the legal standard for the kind of conduct that warrants criminal sanctions." *State v. Warden*, 813 P.2d 1146, 1154 (Utah 1991) (Stewart, J., dissenting); *see also id.* at 1151 (majority opinion) (indicating that criminal negligence is a jury question). A "magistrate's assessment of [the evidence at a preliminary hearing] is deferential, viewed in the light most favorable to the prosecution and with all reasonable inferences given to the prosecution." *State v. Nielsen*, 2014 UT 10, ¶ 51, 326 P.3d 645. "A reasonable inference exists when there is at least a foundation in the evidence upon which the ultimate conclusion is based, while in the case of speculation, there is no underlying evidence to support the conclusion." *Carter v. State*, 2019 UT 12, ¶ 75, 439 P.3d 616 (cleaned up).

¶26   Viewing the evidence deferentially, there is enough evidence here to establish the applicable standard of care. The State presented evidence that Clyde herself knew that the appropriate protocol—that is, the standard of care—in treating

someone suffering from heroin withdrawal would be to monitor blood pressure, provide fluids,[7] and contact the PA. Moreover, Clyde knew that after Inmate requested a doctor, she should perform a dehydration test and ensure that Inmate was keeping fluids down. The RN similarly testified that, under the circumstances, he would have expected Clyde to monitor Inmate's vitals, contact the PA, and "follow-up [a] minimum [of] twice a day." The RN stated that the failure to do these three things was a "deviation from the standard of care." Thus, there was "reasonably believable evidence" that fixed the standard of care. *See State v. Ramirez*, 2012 UT 59, ¶ 9, 289 P.3d 444.

## II. Severity of the Risk

¶27 Clyde next argues that we should affirm the magistrate's bindover decision because there was no evidence of a "substantial and unjustifiable risk" of Inmate's death. *See* Utah Code Ann. § 76-2-103(4) (LexisNexis 2017). Echoing the magistrate's concerns, Clyde argues that there is a lack of evidence on "the likelihood that the risk alleged would result in [Inmate's] death." *See supra* ¶ 17. Specifically, she asserts that "the State presented no evidence on the probability—large or slight—that [Clyde's] conduct would cause [Inmate's] death."

¶28 The State responds that its evidence at the preliminary hearing "established that a person experiencing severe vomiting and diarrhea constitutes 'a potentially very dangerous situation' because a person can die from the resultant severe dehydration." The State also argues that Clyde "should have been aware of the risk" to Inmate because she "usually receives an inmate's intake

---

7. Clyde did deliver a sports drink to Inmate on Wednesday and was aware that the officers had also given her fluids. But the camera, as well as Inmate's medical request form, showed that Inmate was unable to "hold anything down[,] not even water."

papers" and heard from First Officer that Inmate was sick and vomiting "a lot."

¶29    We again agree with the State. "The magnitude of a given risk is determined in part by the probability that the risk will be actualized and in part by the seriousness of the consequence if the risk is actualized." *State v. Standiford*, 769 P.2d 254, 263 n.9 (Utah 1988). This probability to seriousness ratio is fact-dependent, but "the potential of a risk [of] death . . . is always serious." *See id.* Thus, even a small likelihood of death might create a "substantial and unjustifiable risk" of death. *Id.* (cleaned up).

¶30    Here, the risk of not treating Inmate for dehydration was death. The RN testified that "vomiting and having diarrhea for four days" is "definitely . . . a risk" and a "potentially very dangerous situation." And the risk was particularly unjustifiable because, as the medical examiner testified, it is generally avoidable. According to his testimony, dehydration is a "reversible condition" that can be cured, absent other conditions, almost up to the time of death by giving fluids intravenously. In fact, the magistrate recognized that if the jail "had medical visits on Wednesday, we probably wouldn't be here."

¶31    The State also presented evidence that Clyde should have been aware of the risk and was in a position to combat it. Clyde generally would have received Inmate's intake form, which stated that Inmate was withdrawing from drugs or alcohol. Clyde also suspected, despite Inmate's protestations to the contrary, that Inmate used drugs recently. When Inmate said she was not withdrawing from any drugs, Clyde testified that she thought, "Chick, you do some serious drugs and I know you're lying to me." In addition, Clyde received reports from at least First Officer that Inmate was sick and should be moved to court holding for medical observation. Given the seriousness of the risk (death) and the relative

ease with which it can be avoided (IV fluids), we conclude that there was evidence of a "substantial and unjustifiable risk" of death. *See* Utah Code Ann. § 76-2-103(4); *Standiford*, 769 P.2d at 263 n.9.

## III. Gross Deviation

¶32    Having disposed of Clyde's alternative bases to affirm, we turn finally to the State's contention that Clyde's "near complete indifference to [Inmate] grossly deviated from the standard of care" and that the magistrate erred in concluding otherwise. Despite Clyde's knowing that she should monitor Inmate, provide her with adequate liquids, and consult with the PA, the State asserts that Clyde "did none of this." And because "[t]he evidence showed that a person can die from severe dehydration," the State argues that Clyde's "failure to perceive [that risk] constituted 'a gross deviation from the standard of care.'" (Quoting Utah Code section 76-2-103(4).)

¶33    To defend the magistrate's ruling, Clyde relies on *State v. Warden*, 813 P.2d 1146 (Utah 1991), in which the supreme court held that criminal negligence requires, in Clyde's words, "something substantially more than ordinary negligence." *See id.* at 1151 ("[I]t is important to note that criminal negligence differs substantially from ordinary civil negligence."). Clyde argues that "[t]he State failed to show any evidence that [Clyde's] conduct was a gross deviation from the standard of care."

¶34    We agree with the State for a third time. The evidence in this case, taken in the light most favorable to the State, adequately established a reasonable inference that Clyde's near complete indifference to Inmate grossly deviated from the standard of care for treating severe dehydration, especially when the result of a failure to treat is death. Other than checking Inmate's blood pressure on Monday and dropping off a sports drink on Wednesday, Clyde did not take Inmate's vital signs or perform other tests, did not check on Inmate in her

cell, and did not contact the PA, even after receiving a medical request form stating that Inmate had been "puking for 4 days straight" and was unable to "hold anything down." First Officer, who was not charged with Inmate's medical care, informed Clyde that Inmate "was not looking good" and even moved Inmate to court holding to facilitate medical observation because she noticed Inmate's deteriorating condition. And Second Officer may have informed Clyde that Inmate was too weak to get out of bed. Clyde failed to follow the protocol that she identified by not running tests or even "keep[ing] an eye on [Inmate]." Thus, according to the State's evidence at the preliminary hearing, there is "a wide gulf between the standard of care [Inmate] should have received and the care [she], in fact, received." *See id.* at 1152.[8]

---

8. In *State v. Warden*, 813 P.2d 1146 (Utah 1991), the supreme court upheld a conviction of negligent homicide when the defendant, an obstetrician, failed to treat a premature infant for respiratory failure. *Id.* at 1148, 1153. Evidence at trial established that the doctor should have placed the infant "in intensive care immediately after the birth" and "transferred [the infant] to a hospital with the most sophisticated level of neonatal intensive care" if the condition deteriorated. *Id.* at 1152. The obstetrician did none of those things, leaving the infant instead with the parents who had no medical training and who were led to believe that medical attention was unnecessary. *Id.* Here, we are not dealing with a jury's finding of gross negligence beyond a reasonable doubt, as in *Warden*. Instead, we address the much lower standard of probable cause that applies at preliminary hearings. If the doctor's inaction in *Warden* was able to sustain a conviction for negligent homicide, it follows a fortiori that Clyde's inaction here, even if not deemed as extreme as the obstetrician's, supports probable cause to believe that Clyde is guilty of negligent homicide.

¶35　We emphasize that a preliminary hearing is not concerned with the ultimate merits of the State's case, that is, whether the State will be able to prove at trial the defendant's guilt beyond a reasonable doubt. *See State v. Schmidt*, 2015 UT 65, ¶ 18, 356 P.3d 1204. Rather, the "primary purpose of preliminary hearings is to allow magistrates to ferret out groundless and improvident prosecutions without usurping the jury's role as the principal fact-finder." *Id.* ¶ 19 (cleaned up). We accordingly express no opinion on the merits of the State's case but conclude that the State presented "reasonably believable evidence . . . sufficient to sustain each element of" negligent homicide. *See State v. Ramirez*, 2012 UT 59, ¶ 9, 289 P.3d 444. Therefore, the magistrate should have bound Clyde over for trial. *See* Utah R. Crim. P. 7B(b); *Schmidt*, 2015 UT 65, ¶ 43.

## CONCLUSION

¶36　We reverse the magistrate's decision and remand with a mandate to bind Clyde over for trial.

———————