*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2025 UT 12**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellant,*

*v.*

KYLI JENAE LABRUM,
*Appellee.*

No. 20220889
Heard October 30, 2024
Filed May 1, 2025

On Direct Appeal

First District Court, Cache County
The Honorable Angela F. Fonnesbeck
No. 221100561

Attorneys:

Derek E. Brown, Att'y Gen., Karen A. Klucznik, Asst. Solic. Gen.,
Salt Lake City, for appellant

Gregory G. Skordas, Gabriela Mena, Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the
Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN,
JUSTICE HAGEN, and JUSTICE POHLMAN joined.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1     This case concerns the attempted prosecution of Kyli Jenae
Labrum for rape based on allegations that she engaged in an affair
with T.S., a teenaged boy. At the preliminary hearing, a magistrate
judge ruled that the State had failed to present evidence showing
that the relationship was nonconsensual, rejecting the
prosecution's argument that Labrum occupied a position of special
trust in relation to T.S. In response, the State initially moved to

reduce the rape counts to a lesser offense that did not require proof of nonconsent but later decided to pursue the rape charges. First in a motion for reconsideration and then in a refiled proceeding, the State reasserted its original theory of nonconsent and added an alternative theory — enticement. The magistrate rejected both attempts, ruling the reconsideration motion procedurally inappropriate and the refiled charges constitutionally barred. The State appeals the second ruling, arguing that the magistrate erred in its determination that the Utah Constitution's Due Process Clause prohibits the State from refiling rape charges against Labrum. We clarify the governing standard, vacate the ruling, and remand.

## BACKGROUND[1]

¶2   Labrum was twenty-six when she initiated a sexual relationship with T.S., the sixteen-year-old son of Labrum's close friend. The relationship lasted for over a year. The two would rendezvous in Labrum's car, house, and workplace.

¶3   After several community members reported the affair to police, the State charged Labrum with ten counts of rape and one count of forcible sexual abuse. The assigned prosecutor (Assigned Prosecutor) planned to present two theories of nonconsent in support of the charges at the preliminary hearing: a special trust theory (Special Trust Theory) and an enticement theory (Enticement Theory).[2]

¶4   Because of a scheduling conflict, Assigned Prosecutor asked a stand-in prosecutor (Stand-In Prosecutor) to present the State's case at the preliminary hearing. Assigned Prosecutor later recalled discussing both theories of nonconsent with Stand-In

---

[1] We recite the State's version of events for background information but emphasize that all descriptions of Labrum's behavior are unproven allegations.

[2] Under Utah law, rape requires a showing of nonconsent. *See* UTAH CODE § 76-5-402(2)(a) ("An actor commits rape if the actor has sexual intercourse with another individual without the individual's consent."). For a victim of T.S.'s age at the time of the alleged offense, the nonconsent element can be satisfied by showing that the actor either "occupied a position of special trust in relation to the victim" or "entice[d] or coerce[d] the victim to submit or participate." *Id*. § 76-5-406(2)(j), (k).

Prosecutor. At the hearing, Stand-In Prosecutor argued only the Special Trust Theory, and that only briefly.

¶5    Stand-In Prosecutor's approach relied largely on evidence rather than argument. He introduced statements from T.S. and T.S.'s mother (Mom).[3] These statements described the history of the sexual relationship between T.S. and Labrum. They also gave context for the family's longstanding relationships with Labrum, including that:

- T.S. met Labrum when he was between six and eight years old. She was in his life as a close family friend for nearly a decade before they began having sex.

- T.S.'s sister and Mom were especially close with Labrum. Labrum would spend time with all the kids as they grew up.

- Labrum attended many of T.S.'s high school football games and T.S.'s sister's soccer games.

- Mom said that Labrum was "like [her] little sister," that she "looked at [Labrum] as blood," and that she called and saw Labrum more often than her "own blood relatives."

- Mom said she "trusted [Labrum] with [her] children, [her] house and [her] dog."

¶6    After allowing the magistrate judge (Magistrate) time to review this evidence, Stand-In Prosecutor gave a brief closing statement. He opined that the Special Trust Theory was a "unique" feature of the case but maintained that the State had presented enough evidence to satisfy "the low standard of proof" in a preliminary hearing. He argued that the statements contained at least "some evidence" that Labrum's "relationship with this family was beyond acquaintance, beyond incidental, and in fact, there were sometimes [*sic*] when she was actually giv[en] the care of the children, including" T.S.

¶7    Defense counsel observed that the State's theory "seem[ed] to be a bit of a moving target." He expressed confusion as to whether the State meant to maintain that Labrum "had some sort of a babysitter relationship" or had shifted to arguing that Labrum "sort of worked her way into the family or something like that." While acknowledging that Labrum's conduct was not "smart

---

[3] Rule 1102(a) of the Utah Rules of Evidence permits the use of reliable hearsay at preliminary hearings.

or right or even noncriminal," he implored the judge not to take "what's fairly obvious third-degree felonies and make them into first-degree felonies just because."

¶8 Magistrate rejected the Special Trust Theory, ruling that the "close friendship" between Labrum and T.S.'s family did not "in and of itself create a position of special trust" between Labrum and T.S. In response, Stand-In Prosecutor did not press the Enticement Theory. Instead, the *locum tenens* moved to reduce the rape charges to unlawful sexual conduct with a sixteen- or seventeen-year-old, a third-degree felony offense that does not require the State to prove nonconsent. *See* UTAH CODE § 76-5-401.2. Defense counsel later alleged that, after Magistrate denied bindover on the rape charges, Stand-In Prosecutor said he "would have not filed this case."

¶9 When Assigned Prosecutor returned to the case, he moved for reconsideration of Magistrate's decision rather than proceed on the lesser charges. In that motion, he argued that evidence in Mom's and T.S.'s statements supported both the Special Trust Theory and the previously unargued Enticement Theory. Magistrate denied the motion without weighing in on its merits, ruling reconsideration an improper path to relief. She reasoned that motions to reconsider are generally disfavored in Utah and that the State had more appropriate "means and mechanisms" available to it. The deadline to appeal the bindover decision passed while the motion for reconsideration was pending, but Magistrate opined that the State could still "refile [the] charges."

¶10 Assigned Prosecutor moved to dismiss the case without prejudice in anticipation of refiling. Labrum did not object, and Magistrate granted the motion. Three months later, Assigned Prosecutor refiled the original charges. The new case was initially assigned to a different judge.

¶11 Labrum moved to dismiss the rape charges on the grounds that the Utah Constitution's Due Process Clause, as interpreted by *State v. Brickey*, 714 P.2d 644 (Utah 1986), forbade the State from refiling those charges. *Brickey* held that the Utah Constitution's Due Process Clause limits the State's discretion to refile charges after they have been "dismissed for insufficient evidence." *Id.* at 646–47. Specifically, *Brickey* required the State to show good cause for refiling and to refile in front of the same magistrate "whenever possible." *Id.* at 647. A subsequent case, *State v. Morgan*, 2001 UT 87,

34 P.3d 767, altered *Brickey*'s holding, as discussed below. *See infra* section I.

¶12 Labrum argued that the State was "harassing her and engaging in hiding the ball" by presenting its Enticement Theory after failing to argue it at the first preliminary hearing. Labrum contended that the State should have immediately tried to introduce the Enticement Theory at the first preliminary hearing—instead of waiting twenty days to raise it in the motion for reconsideration. As such, Labrum contended that the State had engaged in an abusive practice and lacked "good cause" to refile under *Brickey*. *See* 714 P.2d at 647. Labrum conceded, however, that the State was not engaged in "forum shopping"—another abusive practice in the *Brickey* line of cases.

¶13 In response, the State argued that its failure to adequately support the Special Trust Theory constituted an "innocent mistake of law." It further argued that it had innocently miscalculated the "best" procedural route forward when it moved for reconsideration, thereby missing the deadline to appeal. That miscalculation left refiling as the only option for pursuing the rape charges.

¶14 In her reply in support of her motion to dismiss, Labrum reversed course and accused the State of forum shopping. Although Labrum did not fault the State for the original assignment to a different judge (which she blamed on judicial district procedure), she noted that the State had subsequently "made no efforts" to "ensure" that the case was reassigned to Magistrate. A week after Labrum filed her reply, the new judge transferred the case to Magistrate *sua sponte*.

¶15 Magistrate granted Labrum's motion to dismiss, agreeing that *Brickey* prevented the State from refiling. She offered three rationales for her ruling.[4] First, the State "presented no evidence as it related to the 'without consent' element" of rape at the first preliminary hearing. Second, the State impermissibly "withheld" the Enticement Theory by failing to present it at the first preliminary hearing. In Magistrate's view, withholding a legal

---

[4] In addition to the three reasons discussed here, Magistrate mentioned—seemingly in passing—that the State did not proactively ensure that the second case was transferred to her. We are not convinced this formed a basis for her ruling but address the issue below, nonetheless. *See infra*, section II(C).

theory "is akin to withholding evidence[,] which is clearly prohibited under *Brickey*." Finally, the State failed to appeal the first denial of bindover on the Special Trust Theory. Despite having previously told the State that refiling was one "mechanism" available to it, Magistrate had come to believe that the State must seek appellate review whenever it disagrees with a magistrate judge's decision at a preliminary hearing, at least when the State has no new evidence to present. Any other rule would give the State "a second bite at the apple" in "every case"—a result Magistrate believed *Brickey* foreclosed.

¶16   This appeal followed.

## ISSUE AND STANDARD OF REVIEW

¶17   The State asserts that Magistrate erred when she held that *State v. Brickey*, 714 P.2d 644 (Utah 1986), and its progeny prohibited the refiling of rape charges against Labrum. A "lower court's interpretation of binding case law presents a question of law which we review for correctness." *Utah Dep't of Transp. v. FPA W. Point, LLC*, 2012 UT 79, ¶ 9, 304 P.3d 810 (cleaned up).

## ANALYSIS

¶18   This case turns on whether and when article I, section 7 of the Utah Constitution, our Due Process Clause, permits the State to refile criminal charges after it has failed to establish probable cause for those charges at a preliminary hearing. In *State v. Brickey*, 714 P.2d 644 (Utah 1986), we held that our Due Process Clause requires the State to show good cause to refile and to refile in front of the same magistrate judge who heard the original case whenever possible. *Id.* at 647. The State proposes that we resolve this case either by overruling *Brickey* or by overhauling its central holding. We decline both invitations. Instead, we harmonize *Brickey*'s rule with subsequent caselaw and the general principles that guide our constitutional jurisprudence. We then vacate and remand with instructions to Magistrate to reevaluate this case under the reformulated rule.

I.   CLARIFYING *BRICKEY* AND ITS PROGENY

¶19   We first consider the State's request that we overturn *State v. Brickey*, 714 P.2d 644 (Utah 1986). Parties have some "heavy lifting" to do to persuade us to overrule our precedent. *State v. Sisneros*, 2022 UT 7, ¶ 16 n.3, 506 P.3d 564; *see also Eldridge v. Johndrow*, 2015 UT 21, ¶ 21, 345 P.3d 553 ("Because stare decisis is so important to the predictability and fairness of a common law

system, we do not overrule our precedents 'lightly.'" (cleaned up)). They carry this burden by briefing the two so-called *Eldridge* factors: (1) the strength of the reasoning on which the original precedent rests and (2) the relative entrenchment of the precedent in our law. *See Eldridge*, 2015 UT 21, ¶ 22. The second factor is a composite that includes considerations such as the precedent's age, workability, and consistency with other legal principles, as well as the extent to which overturning the precedent would create hardship or injustice. *See id.* The State did not adequately brief this second factor and therefore failed to carry its *Eldridge* burden.

¶20   In its briefing, the State levels three primary criticisms at *Brickey* and its progeny. First, *Brickey* failed to recognize that, at Utah's founding, our Due Process Clause placed no limits on a prosecutor's ability to refile charges. Second, *Brickey* imposed such limits in a cursory opinion that failed to consult any of our usual sources of constitutional interpretation. And third, a subsequent case, *State v. Morgan*, 2001 UT 87, 34 P.3d 767, recognized the "severity" of *Brickey* but failed to modify its rule adequately. All three points primarily address the strength of *Brickey*'s (and *Morgan*'s) reasoning.

¶21 The State did make one argument in passing that potentially goes toward the entrenchment factor. The district court's ruling seemed to interpret *Brickey* to require the State to present all possible theories in support of a charge at the preliminary hearing. The State contends that this interpretation is inconsistent with our rule that the State may alter its theory of a charge even after trial has begun so long as "the substantial rights of the defendant are not prejudiced." *See* UTAH R. CRIM. P. 4(d); *see also State v. Peterson*, 681 P.2d 1210, 1220–21 (Utah 1984) (holding that an amendment to an information on the last day of trial, which switched the theory of an aggravated assault charge from force resulting in "serious bodily injury" to "force likely to produce death," did not prejudice a defendant's substantial rights because it "did not change the basic charge").

¶22   Assuming the district court's interpretation of *Brickey* was correct in this respect, the State's argument against it certainly touches on *Brickey*'s consistency with our body of law and is therefore relevant to the second *Eldridge* factor. *See Eldridge*, 2015 UT 21, ¶ 22. But ultimately the State's briefing on this point is too cursory to satisfy its heavy burden. Lacking a full picture of all the interests at stake and a more thorough review of analogous

criminal procedure stages, we are not persuaded that we should abandon a nearly forty-year-old precedent—one which we have repeatedly applied. *See, e.g.*, *Morgan*, 2001 UT 87; *State v. Redd*, 2001 UT 113, 37 P.3d 1160. We leave open, however, the possibility of reconsidering *Brickey* on different briefing.[5]

¶23 Although we decline to overrule *Brickey*, we agree with the State that the rule has become muddled in its application. Where a body of caselaw has become overgrown with contradictory or competing branches, the principle of stare decisis can be honored by pruning the rule back to its trunk, grafting in any gaps with default assumptions from our jurisprudence.

¶24 In discussing the evolution of our *Brickey* line of cases, it may be helpful to distinguish between "operative propositions"— that is, judicial interpretation of constitutional meaning—and "decision rules"—that is, the legal principles or adjudicatory mechanisms by which courts gauge compliance with that meaning. *See* Mitchell N. Berman, *Constitutional Decision Rules*, 90 VA. L. REV. 1, 9 (2004).[6] For example, in the context of a due process challenge

---

[5] Alternatively, the State argues that it was not required to brief *Eldridge* because it is "not asking to overturn [*Brickey*'s] fundamental holding that due process limits a prosecutor's ability to refile." This stretches the meaning of "fundamental holding" beyond what the term can bear. It is true that we can retool our precedent, even substantially, without overruling it. *See Rutherford v. Talisker Canyons Fin., Co.*, 2019 UT 27, ¶ 79 n.27, 445 P.3d 474 ("We are always free to clarify ambiguities in past opinions without overruling their holdings. Such a decision is entirely consistent with the principle of *stare decisis*." (cleaned up)). But the State's advocacy for a rule wholly different from *Brickey*'s—one chance to refile as a matter of right "absent evidence of prejudicial abusive prosecutorial misconduct"—goes far beyond a request that we merely "clarify, refine, or reconcile" our precedent, *see Blanke v. Utah Bd. of Pardons & Parole*, 2020 UT 39, ¶ 11 n.6, 467 P.3d 850 (cleaned up). We discuss these issues in greater detail throughout the remainder of this section.

[6] While we find Professor Berman's terminology particularly useful to our analysis in this context, we note that "myriad [other] doctrines and practices . . . accept a gap between constitutional 'meaning' and judicial 'implementation.'" Thomas G. Saylor,

(continued . . .)

to prison discipline, the U.S. Supreme Court held that "[t]he requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board." *See id.* at 60 (quoting *Superintendent v. Hill*, 472 U.S. 445, 455–56 (1985)). This particular holding is a decision rule—a manageable way for a reviewing court to gauge compliance with due process—rather than a constitutional operative proposition—a statement about what sorts of prison discipline the Due Process Clause protects against. *See id.* In *Miranda v. Arizona*, 384 U.S. 436 (1966), the constitutional operative proposition was a determination that the Fifth Amendment privilege against self-incrimination applies at the stage of custodial interrogation. Berman, *supra*, at 107–08 (discussing *Miranda*, 384 U.S. at 460–61). The decision rule designed to enforce compliance took the form of a directive to lower courts to presume any statement given without the benefit of the famous *Miranda* warnings was coerced in violation of the Fifth Amendment. *See id.* at 114–16 (discussing *Miranda*, 384 U.S. at 444).

¶25 Tracking such a distinction helps us to be principled and methodical in the development of our precedent. *See id.* at 92–93. Despite our best efforts, experience often exposes an imperfect fit between the rules we announce and "the reasons that underlie [their] creation." *See id.* at 85. When this happens, "doctrinal refinement"—whether in the form of a minor tweak or, more rarely, a substantial intervention—is necessary to align operative proposition with decision rule. *See id.* at 92–93. To avoid crossing the line from refinement into overruling, we endeavor to stay true to both operative proposition and decision rule.[7] Yet where the two conflict, it is the latter that yields. *Cf. id.* at 92–93 & n.311 (noting

---

*Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged, Prophylactic Rule*, 59 N.Y.U. ANN. SURV. AM. L. 283, 298 n.62 (2003) (cleaned up).

[7] We have addressed the sometimes-narrow line between refinement and overruling before. *See, e.g.*, *Rutherford*, 2019 UT 27, ¶ 79 n.27 (our holding "clarified" rather than overruled precedent where it "remain[ed] true to the [precedent's] core holding" and "d[id] the same work" as a test it concededly "transform[ed]"); *In re Adoption of Baby B.*, 2012 UT 35, ¶ 60 n.23, 308 P.3d 382 (our holding "clarif[ied] . . . latent ambiguities" in a past case where we "left intact" that case's "holding and essential standards").

that stare decisis may apply with less force to decision rules than to operative propositions).

¶26   Although we do not overturn *Brickey* today, the case needs refinement. Over the years, in the "somewhat confusing case law interpreting *Brickey*," *State v. Pacheco-Ortega*, 2011 UT App 186, ¶ 24, 257 P.3d 498, we have tried valiantly, but ultimately unsuccessfully, to wrangle *Brickey*'s gnomic pronouncements into a workable and intellectually consistent system. We will try once more today. We proceed first by attempting to decipher *Brickey*'s precise holding on constitutional meaning and then by sanding down its rule in light of that holding.

¶27 As a constitutional operative proposition, *Brickey* announced that the Utah Due Process Clause "preclude[s] vesting the State with . . . unbridled discretion" to refile criminal charges after a magistrate judge has once found insufficient evidence to bind a defendant over for trial. 714 P.2d at 647. This framing leaves much to be desired. Unusually and unhelpfully, it is both hazy and negative. That is, it identifies a state of affairs that due process cannot possibly permit—one where the State could "easily harass" defendants through refiling—and works backward. *Id.* at 646–47. *Brickey* asserted that "[c]onsiderations of fundamental fairness" militated against allowing unlimited prosecutorial discretion. But we did not explain the constitutional origins or grounding of this pronouncement. *Id.*

¶28  As the State correctly points out, *Brickey* lacked virtually any discussion of our conventional sources of constitutional interpretation: "text, historical evidence of the state of the law when [the Utah Constitution] was drafted, and Utah's particular traditions at the time of drafting." *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 18, 450 P.3d 1092 (cleaned up). *Brickey*'s relative paucity of analysis may be explained by the extreme behavior it confronted: a prosecutor who shamelessly admitted that he would refile charges "until [he got the defendant] bound over." *Brickey*, 714 P.2d at 646. *Brickey* did not have to decide very much to conclude that the prosecutor's behavior was incompatible with the promise of due process. An unlimited refiling regime would effectively nullify the preliminary hearing's role as a "screening device," *see id.*, since—at least when faced with a prosecutor as relentless as *Brickey*'s—a defendant could never truly vanquish meritless charges.

¶29  Oddly, given its underbaked discussion of constitutional meaning, *Brickey*'s decision rule sweeps well beyond what was

needed to resolve the case. First, it prohibits a prosecutor "from refiling criminal charges earlier dismissed for insufficient evidence unless the prosecutor can show that new or previously unavailable evidence has surfaced or that other good cause justifies refiling." *Id.* at 647. Second, it instructs that, "when a charge is refiled, the prosecutor must, whenever possible, refile the charges before the same magistrate." *Id.* The magistrate "does not consider the matter de novo, but looks at the facts to determine whether the new evidence or changed circumstances are sufficient to require a re-examination and possible reversal of the earlier decision dismissing the charges." *Id. Brickey* did little work to justify its decision rule, instead simply asserting that the rule placed a "relatively small burden" on prosecutors while "adequately protect[ing] the due process interests of an accused." *Id.* at 647–48.

¶30 Nor, finally, did *Brickey* sufficiently describe the nexus between its operative proposition and decision rule. That is, it did not explain why our Due Process Clause cabins the State's discretion over refiling in the precise ways the case announced. It never squarely drew the line marking where prosecutorial discretion devolves into unconstitutional harassment. Does the constitutional violation occur where (1) a prosecutor refiles charges with the subjective intent of harassing a defendant, (2) a defendant suffers some level of harassment (how much?) due to refiling, or (3) some combination of (1) and (2)? *Brickey* gestured to a couple of these options, but did not clearly choose among them. *See id.* at 647. In essence, *Brickey* tried to prevent a category of prosecutorial abuse at the preliminary hearing stage without defining it or providing judicially manageable standards for identifying it.

¶31 In *State v. Morgan*, we attempted to shore *Brickey* up, elaborating its clipped constitutional operative proposition and decision rule. *See generally* 2001 UT 87. *Morgan* helpfully clarified the nature of the constitutional violation at stake in *Brickey*. The "due process in [*Brickey*] cases," *Morgan* wrote, guards against "bad faith or misconduct of prosecutors." *Id.* ¶ 22. Both in *Brickey* cases and as a general matter, due process is not implicated by "ordinary levels of inconvenience" to a defendant, nor even by "some level of harassment and oppression," standing apart from intentional misconduct by the State. *Id.* (cleaned up). Properly viewed, then, *Morgan* declaimed that the original purposes of the *Brickey* rule were to (1) "protect defendants from *intentional* prosecutorial harassment arising from repeated filings of groundless claims before different magistrates" and to (2) "prevent[] the State from

*intentionally* holding back crucial evidence to impair a defendant's pretrial discovery rights." *Id.* ¶¶ 13–14 (emphases added).[8]

¶32 But then, despite rooting *Brickey*'s operative proposition in more firmly constitutional soil, *Morgan* went on to read *Brickey*'s decision rule as a prophylactic measure several degrees removed from adjudicating constitutional violations. *See id.* ¶ 16. In *Morgan*'s restatement of *Brickey*'s rule, where "potential[ly] abusive practices" taint an attempt to refile charges, a presumption arises that "due process will bar refiling." *Id.* The State can overcome this presumption by showing good cause to refile. *See id.* ¶¶ 19, 21. The State views this as a relaxation of the original rule because it dispels *Brickey*'s implication that the State must always justify refiling, even where there is no indication of foul play. Be that as it may, *Morgan* also considerably heightened *Brickey*'s restrictiveness by suggesting that *Brickey* did not concern itself with finding *actual* due process violations, but instead with broadly regulating prosecutors by throwing suspicion onto a set of "overzealous practices" that carry mere *potential* for abuse. *See id.* ¶ 15. In short, *Morgan* implied that the State can violate *Brickey* without violating the Utah Constitution.

¶33 In this vein, *Morgan* also spoke of "innocen[ce]," *id.* ¶¶ 17–19—another word that, like "presumption" and "potential," can be read to suggest that *Brickey* holds prosecutors to "best practices" beyond the constitutional minimum. *Morgan* adopted "innocent miscalculation" of the quantum of evidence necessary to secure bindover as "a subsection of other good cause" to refile under *Brickey*. *Id.* ¶ 19. By itself, this move was not particularly problematic. But *Morgan* then held that for a miscalculation of

---

[8] While we affirm *Morgan*'s reading that *Brickey* confined itself to regulation of intentional prosecutorial conduct, we leave open the question whether unintentional prosecutorial conduct might violate Utah's Due Process Clause in other ways. *Cf. Pacheco-Ortega*, 2011 UT App 186, ¶ 22 (inferring from *Morgan* that "atypical" levels of inconvenience to a defendant can implicate due process rights outside of a *Brickey* context).

*Brickey*'s second purpose—protecting defendants from intentional infringement of their discovery rights—has been abrogated by the ratification of the Victims' Rights Amendment. We discuss this issue and its ramifications for Labrum's case in section II(B), below.

evidence to qualify as innocent, any "further investigation" of a case after the denial of bindover had to be "nondilatory." *See id.*

¶34 Two subsequent cases developed this notion in potentially dubious ways. In *State v. Redd*, we held that a prosecutor's miscalculation of evidence was not innocent where the State "failed to provide a scintilla of evidence" as to one of three required elements of a charged crime. 2001 UT 113, ¶¶ 14, 17. The State contended that the statute required proof of only two elements. *See id.* ¶ 15. We rejected this argument and held that the State could not have "innocently miscalculated the quantum of evidence necessary for a bindover" because "the State's experienced legal counsel should have been able to extrapolate these three simple elements and provide evidence sufficient for a bindover." *Id.* ¶¶ 14, 17. This language is susceptible to at least two interpretations. It could reflect an inference that the State's error was so obvious that, under the circumstances of the case, it was more likely than not a product of bad faith. This would be broadly compatible with the way we understand the task *Brickey* assigns to our courts.

¶35 Alternatively, *Redd*'s language could be read—as our court of appeals has read it—to impose an affirmative duty on prosecutors "to reasonably investigate" charges before filing them, entirely apart from the requirement not to act in bad faith. *See State v. Dykes*, 2012 UT App 212, ¶ 11, 283 P.3d 1048 (citing *Morgan*, 2001 UT 87, ¶¶ 13–14, and *Redd*, 2001 UT 113, ¶ 17). As the court of appeals developed this line of reasoning, "to constitute a truly innocent mistake of law, just as with an innocent mistake of fact, the prosecutor [1] must exercise some acceptable level of diligence and [2] must not intend to harass the defendant." *Id.* This first subrequirement effectively rewrites *Brickey* to prohibit *negligent* as well as *intentional* forms of prosecutorial conduct at the preliminary hearing stage. That goes beyond what *Brickey* held our constitution mandates. As *Morgan* clarified, *Brickey* meant to protect against "intentional" prosecutorial bad faith or misconduct. *Morgan*, 2001 UT 87, ¶¶ 13–14, 22.

¶36 In sum, *Morgan* correctly read *Brickey*'s holding on constitutional meaning: *Brickey* stands for the proposition that the Utah Due Process Clause protects defendants from harassment in the refiling of criminal charges that is the product of prosecutorial bad faith or misconduct. *See id.* ¶ 15. In other words, *Brickey* instructs that the constitutional violation turns on prosecutorial intent rather than on the degree of harassment suffered by a

defendant standing alone—although the level of harassment can support an inference that the State was operating in bad faith.

¶37 But *Morgan*'s tweak of *Brickey* ironically moved *Brickey*'s decision rule further from the constitutional principles *Morgan* had clarified. This shift was jurisprudentially misguided. *Morgan* read *Brickey* to adopt a prophylactic rule—that is, a rule "not compelled by the [c]onstitution, but necessary to combat a substantial potential for constitutional violations." 1 Wayne R. LaFave et al., *Crim. Proc.* § 2.9(h) (4th ed., Nov. 2024 update). Prophylactic rules usually work by substituting the presence or absence of some objective indicator for a factual determination that a constitutional violation has occurred. *See id.* (explaining that prophylactic rules "safeguard against a potential constitutional violation, rather than . . . identify what constitutes a constitutional violation").[9]

¶38 Prophylactic rules, with their strong presumptions and proxy metrics, mark a departure from the default standard for constitutional adjudication: proof of an actual constitutional violation. *See* Berman, *supra*, at 10–11. This departure is sometimes justified—where, for example, a prophylactic rule may be most likely to reduce total adjudicatory error. *See id.* at 85–86. This, in turn, may be the case where the nature of the evidence required to prove a constitutional violation—such as evidence about the intent of government actors—is difficult to measure or obtain, making vindication of the right under the ordinary standard difficult or impossible. *See id.* at 61–63; 1 LaFave et al., *Crim. Proc.* § 2.9(h).

¶39 Even in those circumstances where a prophylactic rule may be warranted, however, in Utah there may be reasons to

---

[9] Most famously, *Miranda* and its progeny determined that police failure to administer the so-called *Miranda* warnings prior to custodial interrogation gives rise to a conclusive presumption that the Fifth Amendment right against self-incrimination has been violated. *See* 1 LaFave et al., *Crim. Proc.* § 2.9(h) (discussing *Miranda*, 384 U.S. 436). Another U.S. Supreme Court case, *North Carolina v. Pearce*, 395 U.S. 711 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 803 (1989), created a conclusive presumption that judges act vindictively, in violation of a defendant's Fourteenth Amendment due process rights, when they fail to articulate objective reasons for handing down a higher sentence after a defendant's successful appeal (and subsequent retrial and reconviction). *See id.* at 725–26; *see also* Berman, *supra*, 62 n.206.

believe that they are better promulgated through rule than court decision. *Cf.* Thomas G. Saylor, *Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged, Prophylactic Rule*, 59 N.Y.U. ANN. SURV. AM. L. 283, 308–09 (2003) (arguing that the legitimacy of prophylactic rules is enhanced where state supreme courts adopt them pursuant to their "constitutionally prescribed, supervisory powers"); *see* UTAH CONST. art. VIII, § 4 (vesting primary rulemaking power in the supreme court). Our rules committees can take advantage of broad stakeholder input and other information-gathering tools to suggest changes to rules of procedure. We publish those rules for public comment in hopes of soliciting even more feedback on how the rule will function. With this informational advantage, we may be better suited to craft a prophylactic rule when we act in our rule-making capacity, rather than when we act in our case-adjudication role. When we have the benefit of perspectives beyond those of the parties to a case at bar, we can be better situated to make judgments about the rate of adjudicatory error and the likelihood that a proxy measure will best serve justice.

¶40 An additional advantage of the rule-making process: it is more flexible than constitutional adjudication. Our committees can propose tweaks to rules in response to new data or changing legal landscapes. The Legislature can amend rules of procedure and evidence by a two-thirds vote. *See id.* art. VIII, § 4. By contrast, we can change our constitutional holdings only when an issue comes before us on appeal—and, generally, only where at least one party has fully briefed both *Eldridge* factors. *See Baker v. Carlson*, 2018 UT 59, ¶ 16 n.3, 437 P.3d 333 (deeming appellants' failure to address the *Eldridge* factors "fatal" to their call to overturn precedent). And the Legislature can alter our constitutional holdings only by submitting an amendment to the people in the manner the constitution dictates. *See* UTAH CONST. art. XXIII, § 1.

¶41 We understand why *Morgan* read *Brickey*'s decision rule as prophylactic. The rule, adopted from Oklahoma, was certainly prophylactic in origin. *See Brickey*, 714 P.2d at 647. Oklahoma's rule sharply limited Oklahoma prosecutors' ability to refile on the grounds that unlimited refiling wastes judicial resources and that "refiling . . . *may* constitute harassment of an accused" in violation of "fundamental due process." *Jones v. State*, 481 P.2d 169, 171 (Okla. Crim. App. 1971), *superseded by statute,* 1990 Okla. Sess. Laws, ch. 261, § 4, *as recognized by Haliburton v. State,* 546 P.3d 895 (Okla. Crim. App. 2024) (cleaned up) (emphasis added). This rule

was classically prophylactic in design, in that it "safeguard[ed] against a potential constitutional violation" by adopting a categorical proxy measure, "rather than . . . identify[ing] what constitutes a constitutional violation." *See* 1 LaFave et al., *Crim. Proc.* § 2.9(h). Importantly, however, the Oklahoma court adopted its model under the aegis of its supervisory powers, rather than through a holding about constitutional meaning. *See Haliburton*, 546 P.3d at 897–98 (recognizing a statutory override of the *Jones* line of cases).

¶42 *Brickey* transplanted Oklahoma's supervisory rule into Utah's constitutional soil. It is possible that *Brickey* misunderstood the basis of the cases from which it borrowed. But whether it misread these cases or not, *Brickey* itself announced an unambiguously constitutional holding, noting that it "address[ed]" Brickey's claim "under" Utah's Due Process Clause. 714 P.2d at 646. *Brickey* also suggested that, having surveyed the various state approaches to the problem of harassment through refiling, it had chosen to act through "court decision[]" rather than through "court rule[]." *Id.* at 647.

¶43 We are left with a somewhat mystifying situation. *Brickey* shows some awareness that the constitutional basis of its decision differed in important ways from the supervisory basis of Oklahoma's rule. *See id.* And yet it "adopt[ed]" Oklahoma's approach without explaining how that approach might look different when refracted through an exclusively constitutional lens. *See id.* at 647–48.

¶44 This is where the distinction between constitutional operative proposition and decision rule comes in handy. *Morgan* read each of these parts of *Brickey* well but failed to reconcile the tension between them. Faced with the apparent incongruity between *Brickey*'s operative proposition and its decision rule, *Morgan* should have bent the decision rule to the operative proposition. This hierarchy is not an arbitrary preference. It stems from the very nature of the two concepts and their relation to stare decisis: decision rules exist to enforce our constitution, the meaning of which we determine and crystallize into operative propositions. *See* Berman, *supra*, at 85, 92–93. When decision rules break anchor from the operative propositions that authorize them, they lose their legitimacy. *See id.* at 85. As a result, they may end up overenforcing or underenforcing the right they were designed to protect. Or they may spawn unforeseen collateral consequences in other areas of

law. Thus, when we ensure that a decision rule properly maps onto its operative proposition, we save—or at least, salvage—our precedent, rather than spurn it.

¶45 With these principles in mind, we finish the job *Brickey* began: thinking through how Oklahoma's decision rule can be made to serve the standard of constitutional adjudication—proof that violation of a constitutional right has occurred. To begin with, *Brickey* shifted the burden of proof from the defendant asserting the constitutional right to the State. *See Brickey*, 714 P.2d at 647. This change makes sense. It will ordinarily be difficult for a defendant to obtain evidence of prosecutorial intent. *Cf. Gordon v. State*, 2016 UT 11, ¶ 24, 369 P.3d 1255 (noting that the burden of proof "appropriately shift[s]" to the non-pleading party "where the responding party has unique access to proof of the matter in question"). So *Brickey* left it to the prosecution to produce evidence of its own motives. As long as *Brickey* remains good law, the State must show that it did not act in bad faith when it refiled dismissed charges. *See Brickey*, 714 P.2d at 647.

¶46 We fill out the rest of the revised *Brickey* procedure as follows. There is no presumptive limitation on a prosecutor's ability to refile criminal charges that have been dismissed for insufficient evidence at the bindover stage. *Contra Morgan*, 2001 UT 87, ¶ 16. If the prosecution refiles, a defendant may elect to file a *Brickey* motion. In that motion, the defendant must articulate a reasonable basis to believe that the State refiled the charges in bad faith or with intent to harass. This intent can be linked to behaviors we have identified in our caselaw: "forum shopping," "repeated filings of groundless and improvident charges for the purpose to harass," or refiling after "providing no evidence for an essential and clear element of a crime at a preliminary hearing." *Redd*, 2001 UT 113, ¶ 20. But that list is not exhaustive. Fundamental fairness remains *Brickey's* lodestar. *See Morgan*, 2001 UT 87, ¶ 15. The defense may identify any behavior it believes contributes to an overall inference of bad faith or intent to harass. After the defense has filed its motion, the State must show, by a preponderance of the evidence, why its behavior was not the product of bad faith or an intent to harass.[10] The defense may then seek to rebut the State's

---

[10] Our past language on "innocence" is relevant only to the extent that it is taken to mean that the State is required to show, by a preponderance of the evidence, that it is innocent *of* bad faith or intent to harass.

showing. Finally, the district court "sort[s] through the evidence" and determines whether the State has carried its burden. *Cf. Gordon*, 2016 UT 11, ¶ 26 (explaining the procedural steps in a scenario where, as here, the burden shifts to the non-moving party to disprove a fact by a preponderance of the evidence (citing UTAH CODE § 78B-9-105(2)).

II. GUIDANCE FOR REMAND

¶47 Having clarified the correct legal standard, we remand for the district court to apply it in the first instance. *See State v. Antonio Lujan*, 2020 UT 5, ¶ 8, 459 P.3d 992 (noting that where "we have substantially reformed the law in [a] field," we are "inclined to remand to the district court to allow it to apply our new standards to the facts"). Below, we provide guidance on each of the four errors the State claims to have identified in Magistrate's ruling.

A. *"No Evidence" of Rape's Nonconsent Element*

¶48 Magistrate first determined that the State "presented no evidence as it related to the 'without consent' element" of rape. She acknowledged that the State had "attempted to present evidence" on that element. But she then seemed to conflate an ultimately unsuccessful attempt to present sufficient evidence on an element of a crime with a failure to present any evidence at all, writing that "[t]he State failed to meet its burden and *thus* the cause of action [was] not colorable." (Emphasis added.) She accordingly concluded that, under governing caselaw, the State was barred from refiling because it had provided "no evidence for an essential and clear element of a crime" and lacked good cause to overcome that presumptively abusive practice. (Quoting *State v. Redd*, 2001 UT 113, ¶ 20, 37 P.3d 1160.)

¶49 Magistrate relied on *State v. Redd*, 2001 UT 113, to reach its conclusion. In *Redd*, we held that the State misread a statute to require only two elements where it actually contained three and consequently failed to mount any evidence of one of those three elements. 2001 UT 113, ¶¶ 14, 17. This failure comprised a "potentially abusive practice" where the three elements were "simple," such that "the State's experienced legal counsel should have been able to extrapolate" them from the statutory text. *Id.* We could have been clearer on the precise contours of this holding. It is possible to misunderstand our decision in *Redd* as imposing a duty of diligence on prosecutors in a quest to regulate even negligent behavior through *Brickey*. *See supra* ¶¶ 34–35.

¶50 That is not how we read *Redd*. Instead, we tie the holding tightly to its facts: that is, *Redd* reasoned that, under the circumstances, the State's error was so obvious that it likely resulted from bad faith. This interpretation is supported by a close reading of *Redd*—particularly, its reference to the prosecutor's experience level and its conclusion that the State had not acted "innocently" (to flip *Redd*'s negative: an absence of innocence implies the presence of malintent). *See* 2001 UT 113, ¶¶ 14, 17. This reading also better aligns with the principles animating *Brickey* and our constitutional jurisprudence more broadly: in each case, a judge must determine whether the State's behavior supports an inference of bad faith or intent to harass under the totality of the circumstances.

¶51 We do not wish to be understood as minimizing the State's alarming behavior in *Redd*. Failure to present even "a scintilla of evidence" on an element of a crime at a preliminary hearing, particularly where that element is clear on the face of the authorizing statute, *see id.* ¶ 17, can sustain an inference of bad faith.

¶52 But, in any event, that is not what happened here. Magistrate failed to recognize that a gap exists between "no evidence" and the quantum of evidence required to secure bindover. The threshold required to secure bindover is probable cause, which we have defined in the preliminary hearing context as "sufficient evidence to support a reasonable belief that an offense has been committed and that the defendant committed it." *State v. Clark*, 2001 UT 9, ¶ 16, 20 P.3d 300. We have also stated that "this evidence need not be capable of supporting a finding of guilt beyond a reasonable doubt." *Id.* ¶ 15. And, further, that "[i]t is not appropriate for a magistrate to weigh credible but conflicting evidence at a preliminary hearing, because such a hearing is not a trial on the merits." *State v. Schmidt*, 2015 UT 65, ¶ 31, 356 P.3d 1204 (cleaned up). "Rather, magistrates must leave all the weighing of credible but conflicting evidence to the trier of fact and must view the evidence in a light most favorable to the prosecution, resolving all inferences in its favor." *Id.* (cleaned up). Thus, the quantum of evidence required to clear this standard is "relatively low," *id.* ¶ 17 (cleaned up)—but it is still greater than zero. It is fully possible for the prosecution to put on *some* evidence and still fail to meet its burden of establishing probable cause.

¶53 That is what happened here. The statutory definition of "[p]osition of special trust" is divided into two parts: a list of specific positions—such as aunt, adult sibling, or babysitter—and a catch-all for "any individual in a position of authority . . . which enables the individual to exercise undue influence over the child." UTAH CODE § 76-5-404.1(1)(a)(iv). Several portions of the State's reliable hearsay statements support "a reasonable belief," *Clark*, 2001 UT 9, ¶ 16, that Labrum fell into the catch-all category and thus occupied a position of special trust relative to T.S.:

- T.S. met Labrum when he was between six and eight years old. She was in his life as a close family friend for nearly a decade before they began having sex.

- T.S.'s sister and Mom were especially close with Labrum. Labrum would spend time with all the kids as they were growing up.

- Labrum attended many of T.S.'s high school football games and T.S.'s sister's soccer games.

- Mom said that Labrum was "like [her] little sister," that she "looked at [Labrum] as blood," and that she called and saw Labrum more often than her "own blood relatives."

- Mom said she "trusted [Labrum] with [her] children, [her] house and [her] dog."

It is not entirely clear from the State's evidence the precise nature of the "authority" Labrum allegedly exercised over T.S. *See* UTAH CODE § 76-5-404.1(1)(a)(iv)(W). There is perhaps an argument to be made that Labrum functioned as something of an aunt or an adult sibling—and, further, that the kinds of "authority" satisfying the catch-all definition include the trust and deference between a child and an aunt-like family friend just as much as the strictly hierarchical relation characterizing other entries on the statutory list, such as that between a child and a coach or a child and a religious leader. *See id.* § 76-5-404.1(1)(a)(iv). The State did not advance an argument of this type—nor much of any other—in its sparse oral presentation at the first preliminary hearing.

¶54 Nevertheless, it is not the case that the State put on *no* evidence in support of the Special Trust Theory. To borrow language from the court of appeals, where "the State put[s] on evidence, albeit unsuccessfully, intended to demonstrate" a clear element of a crime charged, "it cannot be said that the State failed

to present *any* evidence" of that element. *State v. Dykes*, 2012 UT App 212, ¶ 9, 283 P.3d 1048.

¶55 Simply stated, *Redd* cannot be used to definitively establish that the State acted in bad faith for both legal and factual reasons. That is, *Redd* did not establish the per se rule Magistrate's order suggested it did. And, even if it had, Labrum's case is factually distinguishable. Labrum is free to argue below that the paucity of argument presented on the Special Trust Theory gives rise to an inference that the State operated in bad faith when it refiled the charges, but she cannot use *Redd* to say that the dearth of argument at the original hearing compels that conclusion.

### B. *Withholding Key Legal Theories*

¶56 The next ground Magistrate gave for granting Labrum's motion to dismiss was that the State impermissibly withheld its Enticement Theory of rape by failing to present it at the first preliminary hearing. Magistrate offered two interlocking reasons for why the State's behavior was impermissible. First, to permit a contrary result would allow the "State to gain an unfair advantage by surprising the defense with an entirely new legal theory, especially after defense counsel has exhaustively prepared for another theory." Second, withholding a legal theory "is akin to withholding evidence[,] which is clearly prohibited under *Brickey*." The State argues that the 1995 Victims' Rights Amendment (VRA) to the Utah Constitution invalidates the legal premises underlying both reasons. We agree.

¶57 The fairness that due process requires must be evaluated in light of the purpose animating a given stage of criminal proceedings. *See, e.g.*, *State v. Brickey*, 714 P.2d 644, 646 (Utah 1986) (before announcing the *Brickey* rule, we considered "the nature and purpose of a preliminary hearing"). The VRA markedly changed the nature of preliminary hearings. Prior to voters' ratification of the VRA, preliminary hearings functioned "in part [as] a discovery device—a means by which the defendant could discover and preserve favorable evidence." *State v. Lopez*, 2020 UT 61, ¶ 44, 474 P.3d 949 (cleaned up). The VRA "eliminated the ancillary discovery purpose of the preliminary hearing and limited that proceeding to the determination of probable cause." *Id.*; *see also* UTAH CONST. art. I, § 12 ("Where the defendant is otherwise entitled to a preliminary examination, the function of that examination is limited to determining whether probable cause exists unless otherwise provided by statute."). Although the amendment was ratified

nearly thirty years ago, some branches of our caselaw have yet to fully register its impact. *See State v. Goins*, 2017 UT 61, ¶ 44, 423 P.3d 1236 (recognizing that certain portions of our caselaw will need to be "revisit[ed]" in light of the VRA as issues are placed "squarely before us").

¶58  Today we clarify that, given the "limited" function of the preliminary hearing post-VRA, *see id.*, the prosecution's decision to not introduce all evidence available to it does not, without a separate finding of bad faith or intent to harass, support granting a *Brickey* motion. This means the second purpose of *Brickey*—to "prevent[] the State from intentionally holding back crucial evidence to impair a defendant's pretrial discovery rights," *State v. Morgan*, 2001 UT 87, ¶ 14, 34 P.3d 767—is abrogated; it now lacks state constitutional grounding.[11] While the defendant retains constitutional pretrial discovery rights, and while rule or statute can provide defendants with greater protections at the preliminary hearing phase than the constitutional baseline, *see Lopez*, 2020 UT 61, ¶ 39, the State is not obligated to introduce evidence at the preliminary hearing stage beyond what is necessary to establish probable cause. The State continues to have an incentive to present more than enough evidence so as to sail safely over the bindover threshold. But, after the VRA, it is not constitutionally required to present all of its evidence. As such, the decision not to introduce some portion of that evidence, without more, does not violate our Due Process Clause.

¶59 Thus, Magistrate's analogy between withholding legal theories and withholding evidence loses much of its force in a post-VRA world. Since the sole purpose of the preliminary hearing is to determine probable cause, defendants no longer possess a state *constitutional* right to use the preliminary hearing to acquire any information—legal or factual—to help them to meet the State's case at trial. Nevertheless, this rule does not grant prosecutors carte blanche. If the State fails to obtain bindover at an original preliminary hearing and subsequently presents new evidence or a

---

[11] Because we are not overruling this portion of our precedent, but rather merely recognizing its abrogation, we are not required to consider the *Eldridge* factors. *See Goins*, 2017 UT 61, ¶ 45 (explaining that "our precedent must yield when it conflicts with a validly enacted statute" or "a constitutional amendment" (cleaned up)).

new legal theory at a second hearing, a judge may infer that the new evidence or theory was withheld for the purpose of harassing a defendant through "repeated filings of groundless claims." *See Morgan*, 2001 UT 87, ¶ 13. Whether that is the correct inference will depend on the totality of the circumstances.[12]

¶60 Here, the State cites a couple reasons why its failure to present the Enticement Theory at the first preliminary hearing was not the product of bad faith. First, it claims Assigned Prosecutor planned to argue both the Special Trust Theory and the Enticement Theory of nonconsent from the beginning and points out that Assigned Prosecutor recalls informing Stand-In Prosecutor of that plan. Second, it argues that Stand-In Prosecutor's decision to reduce the charges, even if it stemmed from a lack of confidence in the case (as Labrum alleges), does not mean that Assigned Prosecutor acted in bad faith in refiling the charges. This is because prosecutors often disagree about the strength of a case. (Citing *United States v. Lovasco*, 431 U.S. 783, 793 (1977) ("The determination of when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions.").)

¶61 Magistrate erred in categorically dismissing these proffered explanations as "internal office politics" that necessarily lie beyond the ken of a judge reviewing a *Brickey* motion. The purpose of the *Brickey* rule is to prevent "intentional" prosecutorial harassment. *Morgan*, 2001 UT 87, ¶ 13. As such, Magistrate's belief that she "cannot speak to assigned prosecutor's state of mind or intent" gets things backwards. That is precisely the job.[13] On

---

[12] The easiest way for the State to show that new evidence was not withheld in bad faith remains for it to show that the evidence was not withheld at all—i.e., that the evidence is "new [to the State] or previously unavailable." *Brickey*, 714 P.2d at 647.

[13] While the *Brickey* inquiry ultimately turns on a determination of prosecutorial intent, we emphasize that the requisite intent may be inferred from objective procedural developments and statements in open court. The State need not offer, and the district court need not consider, purely subjective state-of-mind evidence in every case—or perhaps even in most cases. As emphasized above, the court looks at the totality of the circumstances before it to determine whether the refiling is the product of bad faith or an intent to harass or other prosecutorial misconduct.

remand, Magistrate should weigh the evidence that the State—through either of its agents, Assigned Prosecutor or Stand-In Prosecutor—acted in bad faith when it failed to argue the Enticement Theory at Labrum's first preliminary hearing and subsequently refiled the charges. If the State carries its burden, it may argue the Enticement Theory at a second preliminary hearing.

### C. *Forum Shopping*

¶62  In the State's view, Magistrate dismissed the second case in part because Assigned Prosecutor failed to ensure that the refiled charges were assigned to Magistrate. It is not clear to us that Magistrate actually ruled on that basis. In distinguishing a court of appeals case, largely on other grounds, Magistrate noted in passing that the prosecutor in that case had brought "the refiled action . . . before the same magistrate," lending support to the court of appeals' overall determination that no abusive practice had occurred. *See Dykes*, 2012 UT App 212, ¶ 13. Magistrate then wrote, "Ironically, in this refiled action the matter was not brought before the same trial judge, and, in fact, it was the Court, not the State, that corrected that error." In context, Magistrate seemed to be suggesting just one unfavorable comparison point to *Dykes*' facts among several. Nowhere did she unequivocally rule that forum shopping occurred.

¶63  Moreover, Magistrate did not include forum shopping in a list of the parties' arguments that her ruling would address. This omission is perhaps significant. Labrum disavowed any forum shopping claim in her motion to dismiss—before raising the claim in her reply in support of that motion. By not including forum shopping in a recitation of the parties' arguments, Magistrate appeared to signal that she intended to disregard Labrum's late contention. This would comport with Magistrate's statement, made at oral argument on the motion to dismiss, that "nothing before the [c]ourt" made it "think that the State [was] forum shopping." Additionally, Labrum does not respond to the State's forum shopping arguments on appeal, perhaps suggesting she does not discern any ruling on those grounds in Magistrate's dismissal—or at least, none that could stand as an independent basis for affirmance.

¶64  Nevertheless, in the event Labrum decides to pursue the issue on remand and Magistrate deems it not waived, we offer some guidance on the adjudication of forum shopping claims. *Brickey* announced a categorical duty for prosecutors, holding that

"when a charge is refiled, the prosecutor *must*, whenever possible, refile the charges before the same magistrate." 714 P.2d at 647 (emphasis added). But *Brickey* did not clearly state what consequences would follow from a prosecutor's failure to abide by that duty—whether dismissal or something less. In line with the general approach we announce today, we decline to treat this portion of *Brickey* as a prophylactic rule, the failure to follow which automatically amounts to a constitutional violation. Instead, the "duty" is best taken as a kind of safe harbor provision: if a prosecutor ensures that charges are refiled with the same magistrate who heard the original case, a defendant will necessarily struggle to make out a case that forum shopping has occurred.

¶65 Despite the confusion in our prior articulation of the *Brickey* rule, we believe all our *Brickey* cases effectively applied just this analytical rubric to forum-shopping arguments. *Brickey* itself dealt with a prosecutor who "candidly admitted that he was forum-shopping." *Id. Morgan* concluded that a prosecutor was not forum shopping where "the second preliminary hearing was held before the same magistrate" *and* where there was no evidence of subjective intent to forum shop. 2001 UT 87, ¶ 25 (noting that, "unlike the prosecutor in *Brickey*," the *Morgan* prosecutor did not "admit[] he would refile until obtaining a bindover"). *Morgan* thus framed the State's compliance with the *Brickey* duty to refile in front of the same magistrate as just one factor—albeit a potentially dispositive one under the facts of that case—in a holistic inquiry into whether forum shopping had occurred. *Morgan* did not, in other words, confine its analysis to whether the prosecutor had complied with a mechanical duty, but considered all relevant evidence. *See id.*

¶66 The court of appeals modeled the correct approach to forum shopping claims in *State v. MacNeill*, 2012 UT App 263, 286 P.3d 1278. There, the court held that *Brickey* did not apply to the refiling because the State had voluntarily dismissed the original charges after a successful bindover; but the court went on to consider a residual forum shopping claim grounded in our Due Process Clause. *Id.* ¶¶ 17, 19. For such a claim, the court held, "without some demonstration that a party has set about to forum shop or at least an articulated reasonable basis for concluding that the party has a motive to forum shop, we will not assume that forum shopping has occurred." *Id.* ¶ 20. The court of appeals accordingly examined the record to determine whether the State had engaged in forum shopping, including whether the original

judge had given the State a motive to do so by "tipp[ing] her hand" against the State. *See id.* ¶¶ 20–22.

¶67　The original judge in *MacNeill* granted bindover. *Id.* ¶ 21. The State then moved to dismiss the charges—for reasons not appearing in the record—only to refile them months later in front of a different judge. *Id.* ¶¶ 2, 21. The defendant alleged forum shopping, but the original judge's favorable bindover ruling significantly undermined the defendant's attempts to show that the State had some reason to prefer a different judge in the refiled proceeding. *See id.* ¶ 21. Additionally, the *MacNeill* court attached significance to the fact that the assignment of the second case to a different judge "was a matter of random distribution or other in-house protocol of the [district court]; it was not something orchestrated by the State." *Id.* ¶ 20 n.4.

¶68　In contrast to the facts of *MacNeill*, the State will tend to have at least some motive to forum shop in a *Brickey* case—by definition, the original judge will have ruled against the prosecution at the first preliminary hearing. But even so, "we will not simply assume" that the State acted with "improper motives." *Id.* ¶ 22. There must be some "evidence or reason to believe the State was" in fact "attempting to shop for a more advantageous forum." *Id.*

¶69　Here, Magistrate noted that the district court's e-filing system was by default "required" to assign all cases involving the same defendant to the same judge. She thus attributed the assignment of the second case to a different judge to a technological error and reasoned that there was not "anything nefarious on the part of the State there in re-filing." To use *MacNeill*'s parlance, the switch was not "orchestrated by the State." *Id.* ¶ 20 n.4. On this record, then, Labrum's case for forum shopping is weak. But because Magistrate faulted the State for not proactively seeking to have the case reassigned to the original magistrate and because there is some ambiguity as to whether forum shopping was one of the bases for her ruling, we do not definitively resolve the issue in this appeal.

### D.　*Choice of Procedure*

¶70　Finally, Magistrate dismissed the second case because the State did not appeal the Special Trust Theory before refiling to argue both theories. As discussed above, the State chose to file a motion to reconsider the first case—causing it to miss the deadline for appeal. Magistrate believed she would have had to adopt

"innocent choice of procedure" as a new subcategory of good cause to permit refiling of the Special Trust Theory. She declined to do so, reasoning that the State was aware of the relevant deadlines and, having chosen between available alternatives, had to "live with its actions." She thought that allowing the State to walk down both procedural paths would inevitably "implicat[e] a defendant's due process rights . . . under *Brickey*" by giving the State "a second bite at the apple" in every case.

¶71 The State argued below that it opted for a motion to reconsider "[i]n a calculated effort to avoid the time and cost of an appeal for all parties and to preserve judicial economy." At that point, an appeal could have proceeded only on the Special Trust Theory—because that is all that had been put before Magistrate and, therefore, preserved. If the appeal had been unsuccessful, the State might have attempted to refile on the Enticement Theory, subjecting Labrum to a fresh round of litigation. Faced with the choice between filing a motion for reconsideration—in which it could present both theories at once—and immediately appealing, the State contends the choice it made was "not unreasonable" and was in fact "[a]rguably" more favorable to Labrum than the alternative.

¶72 Canvassing our law on appellate jurisdiction and the *Brickey* line of cases, we find no requirement rendering the State's ability to refile charges contingent on whether it has appealed the dismissal of the first case. Rule 7B(c) of the Utah Rules of Criminal Procedure, for example, permits refiling after dismissal without imposing appeal as a precondition. *See* UTAH R. CRIM. P. 7B(c) (explaining that "dismissal and discharge" for lack of probable cause "do not preclude the state from instituting a subsequent prosecution for the same offense"). Thus, in accordance with our general approach, the State's choice of procedure, where plausibly challenged by a defendant, goes into the totality stew that the district court samples for inferences of bad faith or intent to harass.

¶73 In the present circumstance, we agree with the State that both procedural routes available to it raised the prospect of inconveniencing Labrum. Appeals are often time-consuming and costly. If the State were to subject a defendant to a preliminary hearing on a totally new legal theory after that defendant had spent years contesting an appeal on a different theory, the inference of intentional harassment might be strong. On the other hand, if a prosecutor were to wend her way through alternative legal theories

across multiple filings, that would "raise[] the intolerable specter of the State's continually harassing a defendant who previously had charges dismissed for insufficient evidence." *Morgan*, 2001 UT 87, ¶ 13. As ever, the best way for the State to avoid a *Brickey* problem is to present its "best case at the [first] preliminary hearing." *See State v. Jaeger*, 886 P.2d 53, 54 (Utah 1994). But there can be a gap between best practices and the constitutional floor. And without more, it is not clear that a prosecutor's decision to refile with an original theory and a new theory instead of immediately appealing the original theory compels an inference of bad faith or intent to harass. It remains for the fact finder to weigh competing inferences under the totality of the circumstances.

## CONCLUSION

¶74 We vacate the district court's order granting Labrum's motion to dismiss and remand for new proceedings under the clarified *Brickey* standard. Labrum may identify any actions by the State that are susceptible to an inference of bad faith or misconduct. The prosecution may then put on evidence tending to show that it did not act in bad faith. Once Labrum has had a chance to respond, the district court should consider all the circumstances to determine whether the State acted in bad faith. If the State prevails, it is entitled to a second preliminary hearing, where it may raise either or both of its theories of nonconsent. If Labrum prevails, the State may proceed on the lesser charges bound over after the first preliminary hearing, but it may not seek to reintroduce the rape charges.

---